# 14-2131-CV

## United States Court of Appeals

*for the*

## Second Circuit

―――――――――◆―――――――――

SALIHA MADDEN, on behalf of herself and all others similarly situated,

*Plaintiff-Appellant,*

– v. –

MIDLAND FUNDING, LLC, MIDLAND CREDIT MANAGEMENT, INC.,

*Defendants-Appellees.*

―――――――――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT

DANIEL ADAM SCHLANGER
PETER THOMAS LANE
SCHLANGER & SCHLANGER LLP
343 Manville Road
Pleasantville, New York 10570
(914) 946-1981

– and –

OWEN RANDOLPH BRAGG
HORWITZ, HORWITZ & ASSOCIATES
25 East Washington Street, Suite 900
Chicago, Illinois 60602
(312) 372-8822

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF ISSUES PRESENTED..............................................2

PRELIMINARY STATEMENT ............................................................3

STATEMENT OF FACTS ....................................................................6

STATEMENT OF THE CASE...............................................................7

SUMMARY OF THE ARGUMENT ...................................................10

ARGUMENT .....................................................................................12

   1.  The District Court's Decision Is Subject To De Novo Review ....................12

   2.  The NBA Requires Conflict Preemption Analysis ........................................12

   3.  Text of the NBA Does Not Reveal Any Express Or Implied Intent To Regulate Debt Buyers ..............................................................................................14

   4.  Congress Did Not Intend The NBA To Apply To Non-Bank Debt Buyers ..15

   5.  This Court's Prior Rulings Are Inconsistent With NBA Preemption Of State Usury Laws As Applied To Non-Bank Debt Buyers ..........................................17

   6.  Application of New York's Usury Statute To Non-Bank Debt Buyers Does Not Significantly Interfere With A National Bank's Exercise Of Its Powers......21

   7.  The Weight Of Authority Outside This Jurisdiction Focuses On The Degree Of The National Bank's Continuing Legal Interest And Operation Involvement After Assignment In Determining Whether The NBA Applies..........................25

   8.  The Cases Relied Upon By District Court Are Distinguishable ...................33

   9.  Preemption Is Not Assignable .....................................................................37

   10. Expansion Of NBA Preemption Contradicts Congress And The OCC's Recent Steps To Narrow The NBA's Preemptive Scope .....................................39

CONCLUSION ..................................................................................43

CERTIFICATION PER FED. R. APP. P. 32(A)(7)(C) ...........................44

# TABLE OF AUTHORITIES

## Cases

Altria Group, Inc. v. Good, 129 S. Ct. 538, 543 (U.S. 2008) ..................................18

Augustin v. Jablonsky (In re Nassau County Strip Search Cases), 461 F.3d 219, 224-225 (2d Cir. N.Y. 2006) ..............................................................................13

Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al., 517 U.S. 25, 116 S. Ct. 1103, 134 L. Ed. 2d 237 (1996) ..........................48

Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 9 (2003) ............................... 17, 18

Brown v. Ace Cash Express, Inc., 2001 U.S. Dist. LEXIS 25847 (D. Md. Nov. 14, 2001) ................................................................................................................36

Bruce v. Martin, 845 F. Supp. 146, 149-150 (S.D.N.Y. 1994) ................................4

Cashcall, Inc. v. Morrisey, 2014 W.Va LEXIS 587, *43-44 (W. Va. May 30, 2014) ...............................................................................................................36

Chevron, U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837, 865 (U.S. 1984) ..................42

Citibank (South Dakota), N.A. v. Martin, 11 Misc.3d 219, 293 (Civ. Ct. NY Co. 2005) .................................................................................................................37

Cmty. State Bank v. Knox, 850 F. Supp. 2d 586, 599 n.9, (M.D.N.C. 2012).........33

Culbert v. Rols Capital Co., 184 A.D.2d 612, 613 (2d Dep't 1992)..................…33

Dungan v. Acad. at Ivy Ridge, 344 Fed. Appx. 645, 647 (2d Cir. 2009)...............13

Emery v. Fishmarket Inn of Granite Springs, Inc., 173 A.D.2d 765, 767-768 (2d Dept. 1991) ..........................................................................................................4

Entergy Nuclear Vt. Yankee, LLC v. Shumlin, 733 F.3d 393, 408 (2d Cir. 2013) 13

Faulks v. Wells Fargo & Co., 2014 U.S. Dist. LEXIS 65808, *11-13 (N.D. Cal. May 13, 2014)................................................................................................ 44, 45

FDIC v. Lattimore Land Corp., 656 F.2d 139 (5th Cir. 1981) ................................40

Gerber v. Wells Fargo Bank, N.A., 2012 U.S. Dist. LEXIS 15860, 9-10 (D. Ariz. Feb. 9, 2012) .......................................................................................................43

Goldman v. Simon Prop. Group, 31 A.D.3d 382 (2d Dep't 2006) .........................37

Hudson v. ACE Cash Express, Inc., 2002 U.S. Dist. LEXIS 11226 (S.D. Ind. May 30, 2002)..............................................................................................................33

In re McCorhill Pub., Inc., 86 B.R. 783, 793 (Bankr. S.D.N.Y. 1988) …………..33

Krispin v. May Dep't Stores Co, 218 F.3d 919 (8th Cir. 2000) ..................... passim

Madeira v. Affordable Housing Foundation, Inc., 469 F.3d 219, 241 (2d Cir. 2006)...................................................................................................................14

Marquette Nat'l Bank v. First of Omaha Service Corp., 439 U.S. 299, 314 (U.S. 1978)...................................................................................................................18

Munoz v. Pipestone Fin., LLC, 513 F. Supp. 2d 1076 (D. Minn. 2007)................41

Nichols v. Fearson, 32 U.S. 103 (1833)................................................................38

North American Bank, Ltd. v. Schulman, 123 Misc.2d 516, 520 (Westchester County Ct.1984)……………………………………………………………...32

Pac. Capital Bank, N.A. v. Connecticut, 542 F.3d 341, 351-354 (2d Cir. 2008)...14, 21

Parker v. Time Warner Entm't Co., L.P., 331 F.3d 13, 18 (2d Cir. 2003) .............13

Penermon v. Wells Fargo Bank, N.A., 2014 U.S. Dist. LEXIS 81047, *19 (N.D. Cal. June 11, 2014) ........................................................................44

Phipps v. FDIC, 417 F.3d 1006 (8th Cir. 2005) ......................................................39

Rijhwani v. Wells Fargo Home Mortg., Inc., 2014 U.S. Dist. LEXIS 27516, *21-23 (N.D. Cal. Mar. 3, 2014) ............................................................... 43, 44

Sawyer v. Bill Me Later, Inc., 2014 U.S. Dist. Lexis 71261, *22-30 (D. Utah May 23, 2014)............................................................................................21

Schneider v. Phelps, 41 N.Y.2d 238, 243 (N.Y. 1977)…………...….…………….33

SPGGC, LLC v. Blumenthal, 505 F.3d 183 (2d Cir. 2007) ............................ passim

T & S Chinatown Trading v. Lin China Buffet, 1996 U.S. Dist. LEXIS 11867, 5-6 (S.D.N.Y. Aug. 15, 1996)................................................................4

Ubaldi v. SLM Corp., 852 F. Supp. 2d 1190, 1200 (N.D. Cal. 2012)........ 31, 32, 33

United States v. Locke, 529 U.S. 89, 109 (2000) ....................................................14

Vargas v. Choice Health Leasing, 2010 U.S. Dist. LEXIS 88308 (S.D.N.Y. Aug. 26, 2010) ................................................................................................34

Wachovia Bank, N.A. v. Burke, 414 F.3d 305, 314 (2d Cir. 2005) ................ 16, 19

Watters v. Wachovia Bank, N.A., 550 U.S. 1 (U.S. 2007)............................. 15, 20

West Virginia v. Cashcall, Inc., 605 F. Supp. 2d 781, 788 (S.D. W. Va. 2009) .....35

Wyeth v. Levine, 555 U.S. 555, 577 (2009)..........................................................24

Zink v. First Niagara Bank, N.A., 2014 U.S. Dist. LEXIS 66456, *5-6 (W.D.N.Y. Jan. 27, 2014)....................................................................... 16, 23, 24

**Statutes**

12 U.S.C. § 1867(c)(1)...........................................................................................21

12 U.S.C. § 24, Seventh ................................................................................. 15, 21

12 U.S.C. § 25b.......................................................................................................45

12 U.S.C. § 85 ................................................................................................. 17, 29

15 U.S.C. § 1692, et seq..........................................................................................3, 8

15 U.S.C. § 1692a(3) ................................................................................................6

15 U.S.C. §1692k(d) .................................................................................................1

28 U.S.C. § 1292.................................................................................................1, 9

N.Y. Penal Law § 190.40........................................................................................4, 7

New York General Business Law § 349...................................................................3, 8

New York General Obligations Law, §13-105......................................................45

New York Banking Law §14-a(1) ...........................................................4

**Other Authorities**

Adam J. Levitin, *Hydraulic Regulation:  Regulating Credit Markets Upstream*, 26
    Yale J. on Reg. 143 (2009) ...............................................................20

Arthur E. Wilmarth, *The Dodd-Frank Act's Expansion of State Authority to Protect
    Consumers of Financial Services*, 36 J. Corp. L. 893, 896 (2011) .....................40

Edward V. Murphy, *Who Regulates Whom and How? An Overview of US
    Financial Regulatory Policy for Banking and Securities Markets,* Congressional
    Research Service (May 28, 2013 ........................................................19

S. Rep. No. 111-176 23 at 17 (2010) .......................................................39

**Rules**

Fed. R. App. P. 32(a)(7)(B) ...............................................................51

Fed. R. App. P. 4(b) ........................................................................1

Fed. R. Civ. P. 23(f) .......................................................................9

Fed. R. Civ. P. 54(a) .......................................................................1

**Regulations**

12 C.F.R. § 7.4008(e).................................................................. 47, 48

12 C.F.R. § 7.4008(e) (2004)..............................................................48

12 C.F.R. § 7.4008(e) (2012)..............................................................49

iv

## STATEMENT OF JURISDICTION

This is an appeal from the Stipulation for Entry of Judgment For. Defendants For Purpose of Appeal "So Ordered" by the District Court on June 2, 2014 (the "Stipulation"). A135 – A139. The Stipulation disposed of a peripheral, individual claim left unresolved by the District Court's Order Dated September 30, 2013 (A134) (formalizing entry of the oral ruling issued by the Court earlier that same day denying, *inter alia*, Plaintiff's motion for class certification. A122.)  The Stipulation constituted a final, appealable order.  Fed. R. Civ. P. 54(a).

The Plaintiff filed a timely notice of appeal under Fed. R. App. P. 4(b) on June 9, 2014.  A140.

This Court has jurisdiction over the Plaintiff's appeal pursuant to 15 U.S.C. §1692k(d) and 28 U.S.C. § 1292.

## STATEMENT OF ISSUES PRESENTED

Does the preemption of state usury laws enjoyed by national banks under the National Bank Act extend to non-bank debt buyers where, as here, the national bank retains no interest in or control over the subject accounts, and the national bank and the debt buyer are operationally and legally unrelated entities?

## PRELIMINARY STATEMENT

The District Court ruled that the National Bank Act ("NBA") exempts non-bank debt buyers from New York's usury laws to the same extent as the national bank that originated the account even where, as here, the national bank assignor retains no legally cognizable interest or operational involvement in the accounts post-assignment, and the national bank and the debt buyer are unrelated entities.

As set forth below, the District Court's ruling is inconsistent with the text of the NBA, its implementing regulations, Congressional intent, well-established principles regarding federal preemption of state laws, and the weight of existing precedent. The District Court's ruling constitutes an unwarranted, preemption of New York's criminal usury laws with regard to non-bank debt collection companies that are not mentioned in the text of the National Bank Act, were not intended to receive its benefits, and are not subject to the comprehensive regulatory regime that is the corollary to the preemption national banks enjoy.

Appellant's bring this putative class action pursuant to the Fair Debt Collection Practices Act 15 U.S.C. § 1692, *et seq*. ("FDCPA"), New York General Business Law § 349 (Consumer Protection from Deceptive Acts and Practices), and New York's usury laws against two debt collectors: Respondents Midland Funding, LLC and Midland Credit Management, LLC (collectively "Respondents" or "Midland").

Appellant's claims are based on Respondents' collecting or attempting to collect interest in excess of 25%, in violation of New York's usury statutes. See N.Y. Penal Law § 190.40.[1]

The Class which Appellant seeks to represent consists of all persons in New York who were sent a letter by Defendants attempting to charge interest from the date Respondent took assignment forward at a rate in excess of 25%. According to Respondents, the class numbers 49,780 people.

In seeking to justify the collection of criminally usurious interest from Appellant and the rest of the consumers in the class, Respondents attempt to bootstrap their way into NBA preemption. Specifically, Respondents claim that NBA preemption automatically attached to the loans at their inception and now follows the loans forever, despite their subsequent assignment to a non-bank debt buyer. The District Court, agreed, and denied class certification on this basis. The District Court's decision was based *entirely* on its (incorrect) determination that the exemption from otherwise applicable state usury laws contained in the National Bank Act applies not only to National Banks, but also to non-bank debt buyers.

---

[1] New York's Banking Law §14-a(1) provides that the civil usury rate is 16%. Although the civil usury rate of 16% has been held not to apply where only charged after default, numerous courts have held that New York's criminal usury rate applies to both pre- and post- default interest. Emery v. Fishmarket Inn of Granite Springs, Inc., 173 A.D.2d 765, 767-768 (2d Dept. 1991); Bruce v. Martin, 845 F. Supp. 146, 149-150 (S.D.N.Y. 1994); T & S Chinatown Trading v. Lin China Buffet, 1996 U.S. Dist. LEXIS 11867, 5-6 (S.D.N.Y. Aug. 15, 1996). Respondents do not dispute that absent federal preemption or application of another state's laws on some other basis, the charging of 27% to Plaintiff would be unlawful.

("[M]y ruling that assignees are entitled to the protection of the NBA if the originating bank was entitled to the protection of the NBA, and that under some circumstances, interest greater that 25 percent can be permissible, those rulings mean that the class action device in my view is not appropriate here[.]") A120.[2] That decision is wrong.

In stark contrast to the District Court's decision, the weight of opinion around the country sensibly limits application of the National Bank Act in cases of assignment to those instances in which a national bank, even after assignment, retains some ongoing, legally cognizable interest in the transferred accounts and/or is legally or operationally related to the assignor.

The District Court's decision – which constitutes an unwarranted expansion of the NBA's preemptive reach vis-à-vis debt collection companies that were never intended to receive its benefits – should be reversed.

---

[2] The Court's delivered its opinion in an oral ruling on 9/30/13 (A99-A133), which was codified by a [Summary] Order, issued that same day (September 30, 2013), denying all parties' motions "[f]or the reasons stated on the record". A134. Although, as indicated in the 9/30/13 Order, the District Court denied Respondents' motion for summary judgment, it did so based on individualized fact questions relating to whether Appellant had received a cardholder agreement and whether Appellants' account was transferred to Respondent from the original creditor. A115- A120. These individualized fact questions were resolved by the Stipulation For Entry Of Judgment For Defendants For Purpose Of Appeal. A138. The District Court made clear in its summary judgment discussion, however, that it believed that NBA preemption applied to Respondents. A105-A110. Appellants thus seek reversal of both the District Court's denial of class certification, and as much of the summary judgment discussion as held that NBA preemption applied to Respondents.

## STATEMENT OF FACTS

Appellant Saliha Madden, an individual consumer, got behind on her Bank of America ("BoA") credit card.

Respondent Midland Funding, LLC acquired Ms. Madden's account after default[3], and shortly thereafter sent her a dunning letter, seeking to collect on her purported debt to Bank of America.  A130.1 – A130.4

It is undisputed that the dunning letter sought post-assignment interest at an interest rate of 27 percent.  A130.4.

It is undisputed that New York defines the charging of interest in excess of 25% as a crime pursuant to N.Y. Penal Law § 190.40 ("A person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period.").

It is undisputed that BoA, as a national bank, was not subject to New York's usury laws.  A19, ¶21.

It is undisputed that neither Respondent Midland Funding LLC, nor Respondent Midland Credit Management, Inc. is a nationally chartered bank.

---

[3] See Stipulation, at A138, ¶ 1.

6

Specifically, Midland Funding LLC is a purchaser of defaulted debt and a wholly owned subsidiary of Encore Capital Group, Inc. ("Encore"), one of the largest buyers of defaulted credit card debt in the United States. Respondent Midland Credit Management, Inc. is a debt collection agency, and is also a wholly owned subsidiary of Encore.

It is also undisputed that Respondents are not subsidiaries, affiliates, agents, or otherwise legally or operationally related to BoA.

Finally, it is undisputed that BoA did not retain any legal interest or operational involvement in the subject accounts but, rather, assigned its entire interest to Respondents. For example, it is undisputed that BoA did not assign the receivables to the accounts while retaining ownership of the accounts themselves, did not assign only a percentage interest in the accounts, and did not continue to service the subject accounts. A43 - A44, ¶¶4(c), 5.

## STATEMENT OF THE CASE

This action was commenced on November 10, 2011, and the Complaint was amended as of right on May 2, 2012. A16 – A30.4. Appellant sues under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq*. ("FDCPA"), New York General Business Law § 349 (Consumer Protection from Deceptive Acts and Practices), and New York's usury laws on behalf of herself and all others similarly situations, seeking to represent a class composed of New York consumer who were

sent a letter by Respondents attempting to collect interest purportedly incurred from the date Respondent took assignment of the account forward, at a rate in excess of 25 percent. A30.4, A21 – A22.[4]

On January 18, 2013, Appellant moved for class certification (ECF # 25). On January 25, 2013, Respondents moved for summary judgment (ECF # 30). Also on January 25, 2013, Appellant moved to strike an offer of judgment made to Appellant in her individual capacity (ECF # 35).

On September 30, 2013, the District Court denied all three pending motions in a decision issued from the bench. A134. With respect to the class certification motion, the District Court found that Ms. Madden's claims failed to meet the requirements of Rule 23, based on its finding that Respondents are exempt from New York's usury laws pursuant to NBA § 85. A120.

The District Court did not dismiss Plaintiff's case outright because it found that factual issues specific to Ms. Madden precluded summary judgment on her individual case. Specifically, the Court found questions of fact as to whether Defendant, a debt buyer, had ever purchased Ms. Madden's account and whether the original creditor had sent Ms. Madden the relevant card holder agreement and

---

[4] This class was divided into subclasses in the complaint, based on the applicable statute of limitations for each cause of action.

amendments that authorized interest of 27% to be charged on the account.  A115 – A120.

Appellant sought interlocutory appeal of the denial of class certification, pursuant to Fed. R. Civ. P. 23(f) by motion filed On October 11, 2013.  The motion was denied by Order entered March 4, 2014.

Plaintiff requested that the District Court certify the question now presented for appeal pursuant 28 U.S.C. § 1292(b).  The District Court denied the motion on April 1, 2014 in a ruling issued from the bench (ECF Minute Entry, 4/2/14).

The parties subsequently entered into a Stipulation for Entry of Judgment For Defendants For Purpose of Appeal dated May 30, 2014, which was "So Ordered" by the District Court on June 2, 2014 (the "Stipulation"). A135 – A139. The parties stipulated therein, in relevant part, as follows:

1. The parties stipulate solely for purposes of expediting appeal that FIA assigned Defendants Ms. Madden's account, and that Plaintiff received the Cardholder Agreement and Change In Terms discussed in the Order;

2. The parties acknowledge that the stipulation regarding assignment of the account and receipt of the Cardholder Agreement and Change In Terms, may not be revoked or undone regardless of the outcome of Plaintiff's anticipated appeal to the Second Circuit.

3. In light of this stipulation, a final, appealable judgment in favor of Defendants is appropriate, and the parties hereby stipulate to the entry of Judgment for Defendants per Rule 54 of the Federal Rules of Civil Procedure.

9

A138.

Notice of Appeal was timely filed on June 16, 2014 (A140), and this appeal followed.

## SUMMARY OF THE ARGUMENT

The preemption of state usury laws enjoyed by national banks under the National Bank Act does not extend to non-bank debt buyers where, as here, the national bank retains no interest or control of in the subject accounts, and the national bank assignor and debt buyer assignee are operationally and legally unrelated entities.

Specifically, while a non-bank debt buyer is entitled to collect a balance that includes usurious interest that accrued while the account was owned by a national bank, it is not entitled to charge usurious interest going forward. Rather, the interest a non-bank assignee may charge going forward is limited to 25% by New York's criminal usury statute.

The District Court's finding to the contrary constitutes an unwarranted expansion of the NBA's preemption of state laws. Application of NBA preemption to non-bank debt buyers is not supported by the text of the NBA, nor the well-recognized Congressional intent behind the law, which was to protect national banks from potentially unfriendly state regulators. The District Court's ruling is equally unsupported by OCC regulations, which have specifically included regulation of various non-bank actors, such as operating subsidiaries and

10

servicers, but have declined to extend the same regulations and the corresponding enjoyment of the NBA's preemptive power to debt buyers.

While this Court has never explicitly addressed the question presented, its prior rulings regarding application of the NBA to operating subsidiaries and duly appointed agents indicate a far less sweeping interpretation of the NBA's preemptive scope than the interpretation of the District Court.

The weight of authority from outside this circuit, as well as the state court cases within this circuit, have likewise held that extension of the NBA's preemptive power to a non-bank assignee is proper only where the national bank assignor (a) retains some cognizable interest or operational involvement in the accounts post-assignment and/or (b) the debt buyer assignee is a subsidiary of the national bank assignor.

Neither of those conditions, which sensibly tie application of the National Bank Act to the continuing role of a national bank, are present in the case at bar. As such, and because Respondents have not met their burden to show that application of New York's usury limits to non-bank debt buyers, post-assignment, would significantly interfere with a national bank's exercise of its powers, NBA preemption is not warranted.

11

# ARGUMENT

## 1. The District Court's Decision Is Subject To De Novo Review

The District Court's denial of class certification, which was based on its holding that New York's usury laws do not apply to Respondents as a result of NBA preemption, is subject to de novo review.

Specifically, this Court "review[s] de novo the district court's conclusions of law that informed its decision to deny class certification." Parker v. Time Warner Entm't Co., L.P., 331 F.3d 13, 18 (2d Cir. 2003); Dungan v. Acad. at Ivy Ridge, 344 Fed. Appx. 645, 647 (2d Cir. 2009) (stating same and also noting that the Court's "review of a denial of class certification is "noticeably less deferential than when the district court has certified a class.") (quotations omitted); Augustin v. Jablonsky (In re Nassau County Strip Search Cases), 461 F.3d 219, 224-225 (2d Cir. N.Y. 2006).

This Court has held that a district court's analysis of preemption principles, in particular, is likewise subject to de novo review. Entergy Nuclear Vt. Yankee, LLC v. Shumlin, 733 F.3d 393, 408 (2d Cir. 2013) ("We review de novo a district court's application of preemption principles.") (quotations omitted).

## 2. The NBA Requires Conflict Preemption Analysis

The NBA does not preempt any and all state laws applicable to national banks or banking. Rather, the NBA's preemption of state consumer statutes is

subject to conflict preemption analysis. SPGGC, LLC v. Blumenthal, 505 F.3d 183, 188-189 (2d Cir. 2007); Pac. Capital Bank, N.A. v. Connecticut, 542 F.3d 341, 351-354 (2d Cir. 2008). Conflict preemption "occurs when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." SPGGC, LLC, 505 F.3d 183 at 188 (quoting United States v. Locke, 529 U.S. 89, 109 (2000)); Madeira v. Affordable Housing Foundation, Inc., 469 F.3d 219, 241 (2d Cir. 2006).

The NBA authorizes national banks to exercise various enumerated powers as well as "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24, Seventh.

As this Court has noted:

As the agency charged with implementing the NBA and overseeing national banks in the exercise of their powers thereunder, the OCC has broad authority from Congress to prescribe rules and regulations to carry out its responsibilities. This includes the authority to define the "incidental powers" of national banks and to authorize activities beyond those enumerated in the statute.

SPGGC, LLC, 505 F.3d at 189. Watters v. Wachovia Bank, N.A., 550 U.S. 1, 6-7 (U.S. 2007).

Thus, in order to be preempted, the application of New York's usury laws to non-bank debt buyers must either (1) render compliance with state and federal law impossible; or (2) stand as an obstacle to the accomplishment and execution of the

13

full purposes and objective of congress" as expressed in either the NBA itself or the regulations reasonably implemented by the OCC.

With regard to the latter requirement, "state regulation is preempted if it will 'significantly interfere with the national bank's exercise of its powers.'" Wachovia Bank, N.A. v. Burke, 414 F.3d 305, 314 (2d Cir. 2005) (quoting Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, 517 U.S. 25, 33 (1996)), *cert. denied*, 550 U.S. 913 (2007)(the "Barnett Standard").

Finally, "because federal preemption is an affirmative defense, the burden of proof is on the defendant." *i.e.*, Respondents. Zink v. First Niagara Bank, N.A., 2014 U.S. Dist. LEXIS 66456, *5-6 (W.D.N.Y. Jan. 27, 2014) (quotations omitted).

### 3. Text of the NBA Does Not Reveal Any Express Or Implied Intent To Regulate Debt Buyers

The District Court's ruling did not contain any analysis of the actual text of the statute which, of course, must be the starting point for analysis of the scope of NBA preemption. Pa. Dep't of Pub. Welfare v. Davenport, 495 U.S. 552, 557-558 (U.S. 1990)(noting the "fundamental canon that statutory interpretation begins with the language of the statute itself.")

The NBA states in relevant part:

> Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other

evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located [.]

12 U.S.C. § 85.

There are two key points to note with regard to this language. First, the text directs itself not to the transaction but rather to the entity, *i.e.* the national banking association. Thus on its face the exemption from State usury applies only to national banking associations and not to non-banks. Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 9 (2003) (Section 85 of the NBA "sets forth the substantive limits on the rates of interest that National Banks may charge.")

Second, the statutory text frames the relevant regulatory moment not as the moment the contract is entered into but rather the point(s) at which interest is "charged" (*i.e.*, "Any association may . . .charge on any loan. . . interest at the rate allowed by the laws of the State. . .where the bank is located"). As such, Congress directs the reader to look not at the time of contract formation to make a singular determination regarding preemption which then attaches permanently to the loan regardless of changes in the loan's ownership, but rather directs us to look at each point interest is being "charge[d]" and to ask whether, at that point, an association doing the charging.

## 4. Congress Did Not Intend The NBA To Apply To Non-Bank Debt Buyers

As the Supreme Court has noted, "the purpose of Congress is the ultimate touchstone' in every pre-emption case." Altria Group, Inc. v. Good, 129 S. Ct. 538,

543 (U.S. 2008) (finding a tobacco company not exempt from state consumer protection statute barring false advertising.).

It is well established that Congress, in passing the NBA, meant "to protect national banks against intrusive regulation by the States". <u>Bank of Am. v. City & County of S.F.</u>, 309 F.3d 551, 561 (9th Cir. 2002) (citing Cong. Globe, 38th. Cong., 1st Sess., 1451 (1864); <u>Beneficial Nat'l Bank</u>, 539 U.S. at 10 ("[T]his Court has also recognized the special nature of federally chartered banks. Uniform rules limiting the liability of national banks and prescribing exclusive remedies for their overcharges are an integral part of a banking system that needed protection from 'possible unfriendly State legislation.') (citations omitted); <u>Marquette Nat'l Bank v. First of Omaha Service Corp.</u>, 439 U.S. 299, 314 (U.S. 1978) (the NBA gives "advantages to National banks over their State competitors.") (quotations omitted).

Congress' purpose is not advanced by the position adopted by the District Court. Allowing Respondents to take advantage of an original creditor's federal law usury exemption does nothing to protect a National Bank from intrusive regulation by the state. Instead, it would exempt a non-bank debt buyer from civil and criminal laws regarding usury that it would otherwise be subject to where there is no indication, in the statute itself or its legislative history, that Congress intended this result.

16

**5. This Court's Prior Rulings Are Inconsistent With NBA Preemption Of State Usury Laws As Applied To Non-Bank Debt Buyers**

This Court has sensibly limited applications of the NBA to non-bank entities to situations where (a) the non-bank entity is controlled by the bank and subject to OCC regulation to the same extent as the bank itself and/or (b) explicit mention of the non-bank entity is found in the statute itself.

"Operating Subsidiaries" are the prime example of the first type of non-bank entity covered by the NBA. In Wachovia Bank, N.A. v. Burke, 414 F.3d 305, 314-317 (2d Cir. 2005), this Court approved of the OCC's extension of NBA preemption to "operating subsidiaries" on grounds that such subsidiaries were subject to the "same authorization, terms and conditions that apply to the conduct of such activities by its parent national bank". In doing so, this Court favorably cited the OCC's observation that commenters upon the proposed regulation had "agreed that operating subsidiaries are, in essence, incorporated departments or divisions of the bank, and accordingly, should not be treated differently than their parent banks under State laws." Id. at 312-313.

This holding was subsequently adopted by the Supreme Court in Watters v. Wachovia Bank, N.A., 550 U.S. 1 (U.S. 2007), in which the Supreme Court likewise held that the OCC was authorized to extend NBA preemption to "operating subsidiary[ies] licensed by OCC whose authority to carry on the business coincides completely with that of the bank." In doing so, the Supreme

17

Court emphasized, that the OCC "oversees national bank operating subsidiaries just as it does national banks" and "treats national banks and their operating subsidiaries as a single economic enterprise" and further emphasized that the operating subsidiary in question was "subject to the same terms and conditions as national banks, including the full supervisory authority of OCC." Id. at 16-17.

Third party account servicers working on behalf of a bank have, like operating subsidiaries, been deemed by the OCC to be entitled to NBA preemption on the one hand, and fully subject to OCC regulation on the other. For example, in Sawyer v. Bill Me Later, Inc., 2014 U.S. Dist. Lexis 71261, *22-30 (D. Utah May 23, 2014), a Court held that where the OCC subjects third-party account servicers hired by depository institutions "to regulation and examination by [the FDIC] to the same extent as if such services were being performed by the depository institution itself on its own premises", the servicer is entitled to NBA preemption.

An example of the second type of non-bank entity entitled to NBA preemption (i.e. because it is mentioned in the text of the statute itself) is a non-bank that carries out the bank's business in its capacity as the bank's duly authorized agent. Specifically, the NBA itself "provides that a national bank may exercise 'all such incidental powers as shall be necessary to carry on the business of banking' through the use of 'duly authorized . . . agents." Pac. Capital Bank, N.A. v. Connecticut, 542 F.3d at 352-353 (quoting 12 U.S.C. § 24, Seventh). For

example, where a bank uses a tax preparation service as its duly authorized agent in order to offer tax refund loans to consumers, this Court has held that a state regulation that would, in essence, prohibit the use by the banks of such agents by exposing the agents to crippling financial penalties, is preempted by the NBA.  Id. at 352.

Respondents do not fit into either category.  Unlike an operating subsidiary or third party bank servicer, Respondents are not subject the same broad, uniform and multi-faceted regulatory structure as is BoA, a national bank. [5]  Indeed, Respondents are not regulated by the OCC, at all.

Nor do Respondents claim to be agents of BoA.  BoA maintains no control over Respondents or the accounts, post-assignment.

The statue and regulations are silent as to any intent by Congress or the OCC to grant Respondents the exemption for state usury laws that they seek.  In short, Respondents have "no special status under" the NBA.  SPGGC, LLC, 505 F.3d at 190 (in which the Second Circuit found that a company that entered into a business

---

[5] See, e.g. Edward V. Murphy, *Who Regulates Whom and How? An Overview of US Financial Regulatory Policy for Banking and Securities Markets,* Congressional Research Service (May 28, 2013, noting, *inter alia*, that national banks' "business decisions are regulated for safety and soundness and adequate capital in addition, banks are given access to a lender of last resort, and some bank creditors are provided guarantees deposit insurance." (id. at p. i (Summary)), further noting that the OCC has the authority to strip banks of their state charters in the event of serious misconduct (id. at p.17), and further noting that federal regulators assess banks on the basis of, inter alia, their "capital adequacy", "asset quality", "management capability", "earnings quantity and quality", "liquidity" and "sensitivity to market risk.", i.e. the "CAMELS" rating system (id. at p. 39-40). To put it mildly, non-bank debt buyers are not subject to the same regime.

19

arrangement with BoA regarding the marketing and sale of gift cards was not

entitled to blanket NBA preemption with regard to gift card regulations despite the

fact that BoA had issued the cards in question because "the relationship between

BoA and SPGGC enjoys no special status under the [NBA].").[6]  Zink, 2014 U.S.

Dist. LEXIS 66456 at *14-15 ( "Federal agencies such as the OCC 'have a unique

understanding of the statutes they administer and an attendant ability to make

informed determinations about how state requirements may pose an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress'.

Therefore, I believe that had the OCC intended [a regulation] to preempt state laws

. . . it would have specifically listed that activity in the regulation.") (quoting

Wyeth v. Levine, 555 U.S. 555, 577 (2009).

---

[6] See Adam J. Levitin, *Hydraulic Regulation:  Regulating Credit Markets Upstream*, 26 Yale J.
on Reg. 143 (2009), discussing NBA preemption (including as applied in SPGGC, LLC v.
Blumenthal, 505 F.3d 183 (2d Cir. 2007)) and arguing that debt buyers and other mere
contractual counter parties are not entitled to same:

> [W]hen there is simply a contract relationship, not an agency relationship, the
> national bank is unlikely to be held liable for its contractual counterparty's
> actions, and bank regulators have little cause or ability to examine the
> counterparty's activities. In these circumstances, there is no reason to extend
> preemption doctrine to shield counterparties from state regulation, because there
> is no replacement regulation by federal banking regulators. And when the state
> regulations do not impede national bank powers, there is no conflict to preempt.

Id.  at *180.

**6. Application of New York's Usury Statute To Non-Bank Debt Buyers Does Not Significantly Interfere With A National Bank's Exercise Of Its Powers**

As noted above, it is Respondents' burden to demonstrate that application of the NBA to respondents under the facts of the instant case, would "significantly interfere with the national bank's exercise of its powers."  Barnett Bank, 517 U.S. at 33; Zink, 2014 U.S. Dist. LEXIS 66456, at * 5-6 (Defendants bear the burden of establishing federal preemption of state laws, because preemption is an affirmative defense).

Respondents have not met their burden.  Indeed, they have never argued that application of the NBA to Respondents would significantly interfere with BoA's exercise of its powers, much less produced any evidence to support such a claim.

To the contrary, the evidence provided by Respondents, to the extent it bears on the issue, suggests the opposite, rendering such a finding implausible. Specifically, Respondents claim that out of some 49,780 accounts, they collected in excess of 25% interest with regard to only 485 accounts, *i.e.* with regard to less than 1% of the accounts handled.  A41.

Thus, at best, application of the NBA to non-bank assignees might, perhaps, result in a *de minimus* depression of the price some non-bank entities would be willing to pay for certain types of national bank debt portfolios, or create a marginally stronger market for portfolios in which the bank assigned the

21

receivables only, retained servicing rights, or otherwise created a factual basis for continued application of NBA preemption on balances accruing post-assignment. Even this impact is highly doubtful in light of Respondents representations regarding the rarity with which Respondents actually collect interest above 25% from consumers.  A41.

In any event, NBA preemption cannot possibly be construed as applying to non-bank entities whenever their regulation would have some slight impact on how attractive that non-bank entity found certain bank products or some slight preference that its contracts with the national bank now be structured one way rather than another.  If this were the case, regulation of any entity that regularly did business with banks would become virtually impossible.

This Court's ruling in SPGGC, LLC v. Blumenthal, 505 F.3d 183 (2d Cir. 2007) is instructive.  In SPGGC, a non-bank challenged the validity of the Connecticut Gift Card Law, which prohibited inactivity fees or card expiration dates.  The cards in question were offered by means of a collaboration between SPGGC (the non-bank) and Bank of America.  Specifically, BoA was the issuer of the cards, had review and approval the card terms, and provided access to its Visa debit card infrastructure.  SPGGC established the terms of the cards in the first instance (which it modeled on BoA's own branded gift card terms) and bore all

administrative costs.  The court flatly rejected attempted SPGGC's argument that it

was entitled to blanket NBA preemption:

> SPGGC attempts to analogize its relationship with BoA to the relationship between an operating subsidiary and its parent national bank, over which the OCC has exclusive regulatory jurisdiction. See Watters, 127 S. Ct. at 1572; Burke, 414 F.3d at 309. The district court rejected this analogy, observing that SPGGC did not plead "any facts to indicate that it is a subsidiary of a national bank, such that the NBA would apply to its activities." 408 F. Supp. 2d at 95. "At best," the court found, SPGGC had "a close agency or business relationship with [] BoA"; but that is not sufficient to entitle it to protection under the NBA. Id. at 94. The court acknowledged that if BoA were a plaintiff, "a different analysis might be required." Id. at 95.
>
> In response to a request for amicus briefing by this Court, the OCC argued that the district court took too narrow a view of the preemption question, particularly in light of the Supreme Court's intervening decision in Watters v. Wachovia. Watters, like Burke, involved a state banking commissioner's effort to enforce regulations pertaining to real estate lending against a national bank operating subsidiary. See Watters, 127 S. Ct. at 1565-66. The Supreme Court emphasized  that "in analyzing whether state law hampers the federally permitted activities of a national bank, we have focused on the exercise of a national bank's powers, not on its corporate structure." Id. at 1570 (emphasis in original). The OCC contends that the district court's preemption analysis should have focused less on the identity of the plaintiff, SPGGC, than on whether and to what extent the Simon Giftcard represented an exercise of BoA's powers as a national bank.
>
> We agree with this contention as far as it goes. **However, we believe that it would be a mistake to read Watters so broadly as to obscure the unique role assigned to operating subsidiaries in the context of national banking regulation.** The Court in Watters observed that unlike other types of national bank affiliates, "an operating subsidiary is tightly tied to its parent by the specification that it may engage only in 'the business of banking' as authorized by the Act." Id. at 1571-72 (emphasis added) (citations omitted). Moreover, the authority of national banks to do business through operating subsidiaries is itself a power that Congress granted to the banks through the NBA. See id. at 1572 ("The authority to engage in

the business of mortgage lending comes from the NBA, as does the authority to conduct business through an operating subsidiary.") (citations omitted). **By contrast, the relationship between BoA and SPGGC enjoys no special status under the statute.** Cf. 12 U.S.C. §§ 24(g)(3)(A) (distinguishing operating subsidiaries from other financial subsidiaries), 221a(b) (defining national bank "affiliates").

It is possible that, in certain instances, a national bank's decision to carry out its business through an unaffiliated third party such as SPGGC might constitute an exercise of the bank's incidental powers under the NBA, § 24 Seventh. But **it does not follow that a state's attempt to regulate the third party's conduct is necessarily preempted as it would be if directed toward the bank itself or toward an operating subsidiary.** Significantly, the OCC does not view the regulation of SPGGC's collection of fees as an encroachment on BoA's power, stating specifically in its amicus brief that "we do not believe that the state restrictions on Simon charging a monthly service fee in connection with the gift cards would burden or interfere with national bank powers to issue stored-value cards as a payment mechanism." (emphasis in the original). **In any case, we must ask whether the regulation at issue actually affects the national bank's exercise of any authorized powers or whether it limits only activities of the third party which are otherwise subject to state control.**

SPGGC, LLC, 505 F.at 190-191 (emphasis added).

Notably, SPGGC, LLC held that the regulations regarding expiration dates were preempted to the limited extent that their application would have prohibited BoA from offering Visa gift cards, a power specifically granted to it under the NBA and OCC regulations. Id. at 190.

Here, in contrast, there is no claim (much less any evidence) that application of New York State usury laws to Respondents would in any way infringe on BoA's ability to offer any loan, nor that application of New York's usury laws to non-

24

bank debt buyers' post-assignment charging of interest would have any significant impact on BoA's ability to sell the loans its makes.

Particularly in light of the principles set forth in SPGGC, LLC, the district court's expansion of preemption doctrine to non-bank assignees is unwarranted.

7. **The Weight Of Authority Outside This Jurisdiction Focuses On The Degree Of The National Bank's Continuing Legal Interest And Operation Involvement After Assignment In Determining Whether The NBA Applies**

Where – as here – the original creditor National Bank does not retain any legally cognizable interest or control over the account, the weight of authority holds that the NBA's protections do not extend to non-bank assignees, particularly where the non-bank assignee is legally and operationally unrelated to the original creditor and is not subject to OCC regulation.

The lead case in this regard is Krispin v. May Dep't Stores Co, 218 F.3d 919 (8th Cir. 2000). In Krispin, the May National Bank of Arizona took over the store credit accounts of May Department Stores. The bank, a wholly-owned subsidiary of the store, was established specifically for the purpose of taking over the store's credit card operations. Shortly after the bank's creation, the store and the bank entered into an agreement transferring authority over all customer credit accounts to the bank, and the bank assigned back the "receivables" (*i.e.*, the income stream) to the store. When the bank began charging the consumers fees in excess of what state law would permit, plaintiff brought a class action against May Department

25

Stores (*i.e.*, the non-bank entity). The store relied, in defense, on the federal

exemption from state usury laws for national banks in the NBA.

The Eighth Circuit found that NBA § 85 applied, but in doing so

acknowledged that the "NBA governs only national banks" and emphasized that

the NBA applied because *the bank*, despite having assigned the receivables (*i.e.*,

the income stream) back to the store, continued to control the accounts, and was

thus the *"real party in interest"*:

> [T]he agreement between the store and the bank effected a valid
> **assignment to the bank** of whatever contractual rights and duties the
> store bore toward its pre-existing credit card customers.
>
> Moreover, the store's purchase [back] of the bank's receivables does
> not diminish the fact that **it is now the bank, and not the store, that
> issues credit, processes and services customer accounts, and sets
> such terms as interest and late fees.** Thus, although we recognize
> that the NBA governs only national banks, **in these circumstances**
> we agree with the district court that it makes sense to look to the
> originating entity (the bank), and not the ongoing assignee (the store),
> in determining whether the NBA applies. Accordingly, for purposes
> of deciding the legality of the late fees charged to appellants' credit
> accounts, **we find that the real party in interest is the bank,** not the
> store.

Krispin, 218 F.3d at 923-924 (emphasis added).

The plain import of this language is clear. Because a national bank "now"

exerts significant control over the accounts and is thus "the real party in interest",

the NBA – which "governs only National Banks" – applies.

Indeed, <u>Krispin's</u> focus on whether it is now the store or the bank that controls the accounts is explicit:

> The store characterizes its continuing role in account collection as that of an assignee, and argues that its purchase of the bank's receivables does not alter the fact that appellants' accounts are now controlled by the bank. We agree with the store.

<u>Id</u>. at 7-8.

The District Court, however, misconstrued <u>Krispin</u> as holding that one need not analyze whether a national bank maintains any interest or involvement, and that inquiry stops upon determining whether the entity that originated the loan was a national bank, *i.e.* the precise opposite of Krispin's actual holding as set forth in the excerpt above.  A106, A109.

Plaintiff's analysis of <u>Krispin</u> – although rejected by the District Court below– has been adopted by courts around the countr, which have recognized that the extension of the NBA to assignees in <u>Krispin</u> was premised (a) on the fact that the bank in <u>Krispin</u> assigned only the receivables, but kept title to the account and continued to service the account, and for this reason was the real party in interest; and (b) the bank in <u>Krispin</u> was a subsidiary of the non-bank assignee.

For example, in <u>Ubaldi v. SLM Corp.</u>, 852 F. Supp. 2d 1190, 1200 (N.D. Cal. 2012), the Court rejected analysis of <u>Krispin</u> advanced by Respondents and adopted by the District Court herein, and instead correctly noted the importance of both the subsidiary relationship between the bank and non-bank in <u>Krispin</u>, and the

27

fact that the bank in <u>Krispin</u> had assigned only the account receivables, but

remained otherwise involved in the account:

> Defendant counters that the Court should look to the "originating entity (the bank), and not the ongoing assignee," in determining whether the NBA applies to the student loans, citing <u>Krispin v. May Dept. Stores</u>, 218 F.3d 919, 924 (8th Cir. 2000). <u>Krispin</u> . . . held that class actions brought in state court against a department store company by holders of department store credit cards were subject to complete preemption by the NBA, making removal proper. There, the national bank that issued the credit extensions on the store credit cards was a wholly owned subsidiary of the store. In other words, in Krispin, the store had a very close corporate relationship with the bank, unlike Stillwater and Sallie Mae here. Furthermore, <u>Krispin</u> noted that after the store made a valid assignment to the bank in 1996 of the credit accounts that it originally issued, "the store's purchase of the bank's receivables does not diminish the fact that it is now the bank, and not the store, that issues credit, processes and services customer accounts, and sets such terms as interest and late fees." <u>Id</u>. at 924. The court recognized "that the NBA governs only national banks," but "*in these circumstances* we agree with the district court that it makes sense to look to the originating entity (the bank), and not the ongoing assignee (the store), in determining whether the NBA applies." <u>Id</u>. (emphasis added) (citation omitted). "Accordingly, for purposes of deciding the legality of the late fees charged to appellants' credit accounts, we find that the *real party in interest* is the bank, not the store." <u>Id</u>.
> . . . . The <u>Krispin</u> court relied, in part, on the fact that the bank was responsible for issuing credit, processing and servicing customer accounts, and setting terms such as interest and late fees, 218 F.3d at 924, whereas Plaintiff here alleges that Sallie Mae exerts such control and ownership of the student loans at issue.

<u>Ubaldi</u>, 852 F. Supp. 2d at 1200-1201 (N.D. Cal. 2012)(emphasis in original).

> <u>Hudson v. ACE Cash Express, Inc.</u>, 2002 U.S. Dist. LEXIS 11226 (S.D. Ind.

May 30, 2002) also interpreted <u>Krispin</u> to require analysis of the national bank's

28

ongoing interest in the account, post-assignment. In <u>Hudson</u>, the district court reasoned that the NBA applied because Goleta, the originating bank, not only made the loan but also retained a 5% stake in plaintiff's consumer loan and held that the sale of a 95% participation interest to Ace did not destroy the debtor-creditor relationship between Goleta and the plaintiff. Citing <u>Krispin,</u> the <u>Hudson</u> Court ruled that due to a National Bank's ongoing ownership interest in the account, the NBA applied. <u>Id</u>. at *15 ("The record shows that Goleta actually made the loan and retained an even greater financial interest in its loan to Hudson than the national bank in <u>Krispin</u>, which the Eighth Circuit held sufficient to invoke the National Bank Act in that case.). See <u>Ubaldi</u>, 852 F. Supp at 1201-2 ("unlike <u>Hudson</u>, it is not clear whether or to what extent [the bank] retained any significant stake in or control over Plaintiff's loan.")

Likewise, in <u>Cmty. State Bank v. Knox</u>, 850 F. Supp. 2d 586, 599 n.9, (M.D.N.C. 2012), the Court described <u>Krispin</u> as having found "complete preemption over usury claims where all accounts had been completely assigned to a national bank and all claims were based on actions taken by the national bank after the assignment".

The facts of <u>Krispin </u>and <u>Hudson</u> are in sharp contrast to the case at bar, in which Defendants concede that the National Bank in question had transferred 100% of its rights to Midland and has not retained any financial interest in the

transferred loan.  A43 - A44, ¶¶4(c), 5.  Indeed, the logic of <u>Krispin</u> and progeny dictate that where – as here -- a national bank retains no interest whatsoever in the loan going forward and is not a subsidiary or otherwise related to the assignee, the NBA may not be invoked and the debt buyer is subject to state usury laws.

The weight of case law around the country adds additional support to Appellant's position. For example, in <u>Vargas v. Choice Health Leasing</u>, 2010 U.S. Dist. LEXIS 88308 (S.D.N.Y. Aug. 26, 2010), the Court interpreted the Section 85 of the NBA in a different context.   There, the plaintiff sought to hold defendant Choice Health Leasing ("Choice") accountable under the provisions of the NBA for violating the usury provisions within the NBA.  Choice was not at the time of the action a National Bank, nor was Choice then affiliated with a National Bank. Choice had previously been a wholly-owned owned subsidiary of a National Bank.

In finding that Choice *was not* governed by the NBA, the Court stated:

Section 85 sets forth the substantive limits on the rates of interest that national banks may charge, while section 86 sets forth the elements of a usury claim against a national bank . . . and prescribes the remedies available to borrowers who are charged higher rates.'"[citation omitted]; see also Krispin v. May Dep't Stores Co., 218 F.3d 919, 924 (8th Cir. 2000) **("[T]he NBA governs only national banks.").**

**Plaintiff's NBA claim against Choice fails because Choice is not a national bank.** . . .  Moreover, the plaintiff provides no authority to support her proposition that a defendant which does not fall within the statutory criteria may nevertheless be held liable under the statute on an agency theory. Accordingly, the NBA claim is dismissed.

<u>Id</u>. at *14-16 (emphasis added).

In <u>West Virginia v. Cashcall, Inc.,</u> 605 F. Supp. 2d 781, 788 (S.D. W. Va. 2009), plaintiff alleged that defendant Cashcall was involved in a "rent-a-bank" scheme to avoid state law and collect usurious interest rates. In analyzing whether the case belonged in federal court or in state court, the federal court declined to assert federal jurisdiction, stating:

> It is true that in some cases, courts have found that state usury law claims nominally directed against a non-bank entity were actually directed against a related bank and thus were completely preempted by the FDIA or NBA. . . . But those cases are distinguishable from this one. . . . **[T]he state-banks and agents in <u>Vaden</u> and <u>Krispin</u> were related either through an indemnity agreement or through their corporate structure. In contrast, CashCall and the Bank are completely separate entities.**

<u>Id.</u> at 787 (citations omitted)(emphasis added).   The <u>CashCall</u> Court further pointed out that the defendant "confuses what this case is and is not about. The Complaint strictly is about a non-bank's violation of state law. It alleges no claims against a . . . bank." <u>Id.</u> at 788.   Here, as in CashCall, Respondents are completely separate entities from any National Bank and Appellant neither brings a claim against the originating national bank, nor accuses it of any wrongdoing.  See, also <u>Cashcall, Inc. v. Morrisey</u>, 2014 W.Va LEXIS 587, *43-44 (W. Va. May 30, 2014) (same); <u>Brown v. Ace Cash Express, Inc.</u>, 2001 U.S. Dist. LEXIS 25847 (D. Md. Nov. 14, 2001)(court declined to grant federal jurisdiction, saying "ACE itself is not a National Bank, nor is a National Bank named as a party to this lawsuit. . .

.This very effectively distinguishes this case from the only reported appellate precedent cited by defendant for viewing Goleta as the real defendant in the case, *viz.*, Krispin v. May Dep't Stores Co., 218 F.3d 919 (8th Cir. 2000), where the national bank involved was a wholly-owned subsidiary of the named defendant.")

State law, too, reinforces Appellant's position. In Goldman v. Simon Prop. Group, 31 A.D.3d 382 (2d Dep't 2006), New York's Appellate Division declined to find that the NBA preempted state consumer protection laws regarding fees associated with gift cards:

> The [New York] Supreme Court determined that although the [gift] card was marketed by a non-bank entity, a national bank was the originating entity which issued the card and, as such, the national bank was the real party in interest. We reverse. . . . The record indicates that the defendant and the national bank are separate entities [citation omitted]. More importantly, the record indicates that it is the defendant, and not the bank, that . . . charges and collects the disputed fees (cf. Krispin v May Dept. Stores Co., 218 F3d 919, 924 [8th Cir 2000]).

Id. at 383. See also, Citibank (South Dakota), N.A. v. Martin, 11 Misc.3d 219, 293 (Civ. Ct. NY Co. 2005) (contractual credit card interest "may be altered if the account is assigned by a National or FDIC insured bank to a nonbank assignee, for such an assignee may be limited to the statutory interest after the assignment.").

Indeed, it is worth noting in this regard that New York's state laws against usury reflect a fundamental public policy . North American Bank, Ltd. v. Schulman, 123 Misc.2d 516, 520 (Westchester County Ct. 1984) ("[T]he policy

32

underlying our State's usury laws is in fact of a fundamental nature.")(citing

Schneider v. Phelps, 41 N.Y.2d 238, 243 (N.Y. 1977); In re McCorhill Pub., Inc.,

86 B.R. 783, 793 (Bankr. S.D.N.Y. 1988); Culbert v. Rols Capital Co., 184 A.D.2d

612, 613 (2d Dep't 1992).

### 8. The Cases Relied Upon By District Court Are Distinguishable

The cases relied upon by this Court are inapposite.  For example, this Court

relies, in error, on the holding of an ancient case, Nichols v. Fearson, 32 U.S. 103

(1833), which stated in a wildly different context that "a contract, which, in its

inception, is unaffected by usury, can never be invalidated by any subsequent

usurious transaction."  That case dealt with the question of whether, by selling a

promissory note at a discount, the note was converted into a usurious loan, *i.e.* if

the difference between the face amount of the promissory note and the amount for

which the note was later sold might be construed as "interest" chargeable to the

debtor, such that the note (originally charging non-usurious interest or perhaps no

interest at all), might subsequently be deemed usurious and void.   Not

surprisingly, the Court answered in the negative.  Id. at 110 (rejecting the premise

that a non-usurious loan could be "rendered at least valueless in the hands of the

otherwise legal holder" as a result of being purchased at a discount).

The facts in Nichols v. Fearson are wholly unlike the facts before the Court

in the case at bar. Here, Appellant is not asking the Court to examine the terms of

the transaction by which Respondents acquired the debts from the original creditor, nor to rule that the loan be converted, after-the-fact, into one that "valueless" as a result of having been purchased at a discount.

Instead, Appellants's claim focuses entirely on Respondent's conduct after it allegedly purchased the loans in question, *i.e.* its decision to charge an interest rate higher than 25% going forward, despite the fact that it is not a national bank and therefore does not enjoy the usury exemption as did the original creditor pursuant to the NBA.

Phipps v. FDIC, 417 F.3d 1006 (8th Cir. 2005) is distinguishable for largely the same reason. In Phipps, the plaintiff held that various charges by a national bank related to loan origination were unlawful under state law, claiming that the charges were not "interest" for purposes of the National Bank Act (and therefore not subject to NBA preemption). The Court held that the charges were, in fact, properly characterized as interest under the applicable federal NBA regulations and that state law barring them was therefore pre-empted. In dismissing the case, the Eighth Circuit, without significant discussion, upheld dismissal against both the National Bank that had levied the charges and a subsequent non-bank assignee. Notably, the ability of the non-bank assignee to levy such charges *post-assignment* was not at issue. Rather, the plaintiff in Phipps sought to reach backward and label usurious those monies already charged by a National Bank and to fault both the

34

non-bank assignee and the national bank assignor for the bank having collected these monies. Put differently, plaintiff therein argued that the transfer of the mortgage obligations to a non-bank entity had rendered those mortgage closing costs, _retroactively_, unlawful.

Unlike in Phipps, Appellant in the case at bar makes no effort to erase or label usurious fees already legitimately charged by a national bank. Here, Appellant looks solely to the post-assignment conduct of the non-bank assignee.

The District Court's reliance on FDIC v. Lattimore Land Corp., 656 F.2d 139 (5th Cir. 1981) is likewise misplaced. In Lattimore, a national bank based in a state with more restrictive usury laws purchased a loan made by a non-bank lender in a state with less restrictive usury laws. The bank was subsequently taken over by the FDIC, which attempted to enforce the note in a bankruptcy proceeding. The borrower asserted a defense of usury based on application of the NBA. In rejecting the usury claim and finding that the NBA did not apply, the Fifth Circuit, _inter alia_, quoted the language from Nichols discussed above. However, the Lattimore Court was concerned with the way that application of the NBA to the transaction -- which would impose a limitation on a national bank purchasing loans from non-bank in a higher interest state -- was antithetical to the pro-national bank policy embodied by the NBA:

> The obligors' argument, thus, appears to undercut the purpose
> of the National Bank Act which was designed to enhance the

35

competitiveness of national banks. . . . This discussion further confirms our view that an acquisition of a pre-existing note by a National bank **does not alter the usury limits applicable to this note when the National bank is located in a state with more restrictive laws than the state where the note was made.**

Id. at 150 (emphasis added) (citations omitted).

In sum, Lattimore involves a finding that – in order to vindicate the pro-national bank policies underlying the NBA – the NBA usury cap should not be applied to banks in low interest states that purchase loans from non-banks in high interest states. This holding and its underlying rationale –whatever its merits – simply have no application to the case at bar.[7]

The District Court also made a logically flawed policy argument for its view of the preemptive effect of the NBA, stating that "prohibiting assignees, such as Defendants, from charging the same interest rate as the assignor would give debtors, such as Plaintiff, a perverse incentive to avoid their obligations long enough to ensure that their debt was charged off and assigned to a debt collector required to charge a lower interest rate." A109.

This is incorrect. It is only after the National Bank bows out of the picture that a non-bank debt buyer must, with regard to interest charged *going forward*,

---

[7] Finally, the District Court relied on Munoz v. Pipestone Fin., LLC, 513 F. Supp. 2d 1076 (D. Minn. 2007), an out-of-Circuit case which, without any substantive analysis or discussion, misread the Krispin and Phipps to stand for the proposition that NBA preemption applies whenever it is determined that the original creditor was a national bank.

comply with New York's usury laws, i.e. not exceed 25%. As a result, nothing in Appellant's position would cause a consumer's existing balance to go down as a result of assignment of the debt, and a consumer would not have any incentive to wait until after assignment of the account to pay.

Moreover, a court cannot imply preemption based on its own policy preferences. Chevron, U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837, 865 (U.S. 1984) ("Judges are not experts in the field, and are not part of either political branch of the Government. Courts must, in some cases, reconcile competing political interests, but not on the basis of the judges' personal policy preferences.")

## 9. Preemption Is Not Assignable

Underlying Respondents' and the District Court's position is the assumption that, just as contractual rights are assignable, so to federal preemption of state laws may be freely bought and sold.

This assumption is incorrect. This Circuit has not addressed the issue, but a growing number of Courts in the Ninth Circuit have recently confronted the issue and sided with Appellant on this issue. For example, in Gerber v. Wells Fargo Bank, N.A., 2012 U.S. Dist. LEXIS 15860 (D. Ariz. Feb. 9, 2012), the Court addressed whether Wells Fargo, a national bank that took assignment of the assets of Wachovia, a federal savings association, was entitled to the broader field preemption enjoyed by federal savings associations under Home Owners Loan Act

(HOLA) or the narrower conflict preemption available to national banks under the

NBA.  In rejecting Wells Fargo's position, the Court stated in relevant part:

> [P]reemption is not some sort of asset that can be bargained, sold, or
> transferred. HOLA preemption was created by the OTS for the benefit
> of federal savings associations, and § 560.2 plainly seeks to avoid
> burdening the operations of federal savings associations. Wells Fargo
> is not a federal savings association, and its cited cases are therefore
> not persuasive. HOLA preemption does not apply to Wells Fargo.

Id. at *9-10.  See Rijhwani v. Wells Fargo Home Mortg., Inc., 2014 U.S.

Dist. LEXIS 27516, *21-23 (N.D. Cal. Mar. 3, 2014), adopting Gerber and

collecting the "growing number" of similar cases, and critiquing contrary

authority); Penermon v. Wells Fargo Bank, N.A., 2014 U.S. Dist. LEXIS 81047,

*19 (N.D. Cal. June 11, 2014); Faulks v. Wells Fargo & Co., 2014 U.S. Dist.

LEXIS 65808, *11-13 (N.D. Cal. May 13, 2014) (adopting Gerber);

These cases stand for the proposition that while an assignee may be entitled

to preemption with regard misconduct alleged to have been committed by the

assignor prior to assignment, the assignee does not enjoy the assignor's preemption

where the alleged misconduct is committed by the assignee post-assignment.  See,

e.g. Rijhwani, 2014 U.S. Dist. LEXIS 27516 at *23 ("Here, all of the wrongful

conduct alleged by Plaintiffs was done by Wells Fargo  and occurred . . . well after

Wachovia merged into Wells Fargo.  This means that Wells Fargo, which is not a

federal savings association or bank, may not assert HOLA preemption in this

particular action."); <u>Penermon</u>, 2014 U.S. Dist. LEXIS 81047 at *19 (same);

<u>Faulks</u>, 2014 U.S. Dist. LEXIS 65808, at 11-13 (same).

Under this analysis, Respondents do not enjoy NBA preemption in the case

at bar: Like the plaintiffs in <u>Gerber</u> and progeny, Appellant challenges only the

post-assignment conduct of Respondents, *i.e.* Respondents decision to continue to

charge interest over 25% on the accounts going forward, after taking assignment.

See also New York General Obligations Law, §13-105 (creating an exception to

the general assignability of claims and defenses "where the rights or liabilities of a

party to a claim or demand, which is transferred, are regulated by special provision

of law").

### 10. Expansion of NBA Preemption Contradicts Congress And The OCC's Recent Steps To Narrow The NBA's Preemptive Scope

Congress has recently taken steps to guard against precisely the sort of

unwarranted expansion of NBA preemption exemplified by the District Court

herein. Specifically, Dodd-Frank re-wrote the law governing when the NBA

preempts state laws to make it harder to establish such preemption. 12 U.S.C. §

25b.

In the run-up to Dodd-Frank, Congress had expressed concern that, through

its excessively broad preemption positions, the OCC had "actively created an

environment where abusive mortgage lending could flourish without State

controls." S. Rep. No. 111-176 23 at 17 (2010). Accordingly, to "correct the

problems created by federal preemption," Congress intended that Dodd-Frank

would "enlarge[ ] both the law making and the law enforcement functions of the

states in the area of consumer financial protection." Arthur E. Wilmarth, *The*

*Dodd-Frank Act's Expansion of State Authority to Protect Consumers of Financial*

*Services*, 36 J. Corp. L. 893, 896 (2011).

As the Court explained in <u>Meluzio v. Capital One Bank (USA), N.A.</u>, 469

B.R. 250 (N.D. W. Va. 2012):

> Among these reforms was an entirely new provision addressing NBA
> preemption, 12 U.S.C. § 25b (effective July 21, 2011), which, in
> pertinent part, provides: State consumer financial laws are
> preempted, only if—
>
> > (A) application of a State consumer financial law would
> > have a discriminatory effect on national banks, in
> > comparison with the effect of the law on a bank
> > chartered by that State;
> > (B) in accordance with the legal standard for
> > preemption in the decision of the Supreme Court of the
> > United States in Barnett Bank, 517 U.S. 25 (1996), the
> > State consumer financial law *prevents or significantly*
> > *interferes with the exercise by the national bank of its*
> > *powers*; and any preemption determination under this
> > subparagraph may be made clear by a court, or by
> > regulation or order of the Comptroller of the Currency
> > on a case-by-case basis, in accordance with the
> > applicable law; or
> > (C) the State consumer financial law is preempted by a
> > provision of Federal law other than title 62 of the
> > Revised Statutes.  12 U.S.C. § 25b(b)(1)(emphasis
> > added).

Id. at 254-255.[8]

To reflect Dodd-Frank's mandate that preemption of consumer protection statutes be more narrowly construed, the OCC subsequently narrowed its own preemption regulations. Previously, the OCC exempted from preemption various classes of laws (including laws concerning "debt collection", "contract" and "criminal law") merely "to the extent they *only incidentally* affect the exercise of national banks' non-real estate lending powers." 12 C.F.R. § 7.4008(e) (emphasis added). In light of Dodd-Frank, the OCC significantly broadened its regulatory savings clause regarding state laws exempt from preemption:

> state laws on the following subjects are not inconsistent with the non-real estate lending powers of national banks and apply to national banks to the extent consistent with the decision of the Supreme Court in Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al., 517 U.S. 25, 116 S. Ct. 1103, 134 L. Ed. 2d 237 (1996):
> (1) Contracts;
> (2) Torts;
> (3) Criminal law . . .;
> (4) Rights to collect debts;
> (8) Any other law that the OCC determines to be applicable to national banks in accordance with the decision of the Supreme Court in Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al., 517 U.S. 25, 116 S. Ct. 1103, 134 L. Ed. 2d 237 (1996) or that is made applicable by Federal law.

---

[8] New York's usury states are clearly "State consumer financial laws" as defined under Dodd-Frank, *i.e.* they are laws that do "not directly or indirectly discriminate against national banks and that directly and specifically regulates the manner, content, or terms and conditions of any financial transaction (as may be authorized for national banks to engage in), or any account related thereto, with respect to a consumer." Id. § 25b(a)(2).

41

12 C.F.R. § 7.4008(e).

Thus, under Dodd-Frank, it is no longer sufficient for a national bank to show that a regulation "more than incidentally affects the exercise of" its powers. Rather, courts are to determine whether state laws having an effect on national banks are preempted by applying the conflict preemption principles found in <u>Barnett Bank</u>, *i.e.,* the Court may only properly find preemption where application of the state law 'significantly interfere[s] with the national bank's exercise of its powers". <u>Barnett Bank</u>, 517 U.S. at 33. *Compare* 12 C.F.R. § 7.4008(e) (2004) *with* 12 C.F.R. § 7.4008(e) (2012)[9]

These recent statutory and regulatory changes run contrary to the District Court's expansive reading of the NBA's preemptive power.

---

[9] <u>Meluzio v. Capital One Bank (USA), N.A.</u>, 469 B.R. 250 (N.D. W. Va. 2012) also noted that:

> Dodd-Frank imposes a new and far more onerous process on the OCC before it can preempt state consumer financial services laws. Henceforth, the OCC may only preempt a state law if the OCC issues a regulation or order. 12 U.S.C. § 25b (b)(3). Thus, Congress has now prohibited the OCC's use of opinion letters issued at the behest of national bank's inventing new rules of preemption, and instead mandated that the agency preempt state laws on the basis of "substantial evidence, made on the record," in a case-by-case proceeding that then gives rise to a formal regulation or order. *Id.* Any preemption analysis will also need to consider this new requirement as well [.]

<u>Id</u>. at 254-255.

## CONCLUSION

For the foregoing reasons, this Court should find that the preemption of state usury laws enjoyed by national banks under the National Bank Act does not extend to non-bank debt buyers where the national bank does not retain an interest in or control over the subject accounts, and the national bank and the debt buyer are not operationally or legally related entities. The District Court's order should be reversed, and this case should be remanded for further proceedings.

Respectfully submitted,

*s/Daniel A. Schlanger*
Daniel A. Schlanger, Esq.
Peter T. Lane, Esq.
Schlanger & Schlanger, LLP
9 East 40th Street, Suite 1300
New York, NY 10016
T: 914.946.1981, ext. 101
F: 914.946.2930
daniel.schlanger@schlangerlegal.com.
peter.lane@schlangerlegal.com

O. Randolph Bragg, Esq.
Horwitz, Horwitz and Associates
25 E. Washington, Suite 900
Chicago, Illinois 60602
T: 312.372.8822
F: 312.372.1673
rand@horwitzlaw.com

*ATTORNEYS FOR APPELLANT*

43

## CERTIFICATION PER FED. R. APP. P. 32(A)(7)(C)

This is to certify that the foregoing brief complies with the 14,000 word limitation

requirement of Fed. R. App. P. 32(a)(7)(B), in that the brief is calculated by

Microsoft Word to contain 10,735 words, exclusive of the Table of Contents and

Table of Authorities.