# 14-2131-cv

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT



SALIHA MADDEN, on behalf of herself
and all others similarly situated,

*Plaintiff-Appellant,*

*v.*

MIDLAND FUNDING, LLC,
MIDLAND CREDIT MANAGEMENT, INC.,

*Defendants-Appellees.*

*On Appeal from the United States District Court
for the Southern District of New York (White Plains)*

## BRIEF FOR DEFENDANTS-APPELLEES

Thomas Arthur Leghorn
Joseph L. Francoeur
WILSON ELSER MOSKOWITZ EDELMAN
& DICKER LLP
*Attorneys for Defendants-Appellees*
150 East 42nd Street
New York, New York 10017
212-915-5234

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................ ii

Preliminary Statement.............................................................................1

Corporate Disclosure Statement ............................................................1

Summary of Argument ............................................................................2

Counter-Statement of Facts.....................................................................4

Procedural History ..................................................................................5

Questions Presented ................................................................................6

Argument..................................................................................................6

    Point I.    Madden Has No Viable Claim As Delaware Law
                    Permits The Interest Rate Charged ....................................7

    Point II.   The NBA Applies In The Event Of An Assignment ......................10

                   Madden's Numerous Citations to Admittedly
                     Non-Applicable Situations Do Not Change
                   The Analysis ........................................................................21

Conclusion ...........................................................................................25

Certification Per Fed. R. App. P. 32(A)(7)(C)......................................26

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Baur v. Veneman*, 352 F.3d 625 (2d Cir. 2003).........................................7

*Brewer v. West Irondequoit Cent. Sch. Dist.*, 212 F.3d 738
(2d Cir. 2000).....................................................................7

*Community State Bank v. Knox*, 850 F Supp.2d 586 (M.D.N.C. 2012) ............18, 19

*FDIC v. Lattimore Land Corp.*, 656 F.2d 139 (5th Cir. 1981)..........................15, 16

*Goldman v. Simon Property Group, Inc.*, 31 A.D.3d 382
(2d Dep't 2006).....................................................................20, 21

*Hartford Courant Co. v. Pellegrino*, 380 F.3d 83 (2d Cir. 2004) ............................7

*Hudson v. ACE Cash Express, Inc.,* 2002 U.S. Dist. LEXIS 11226
(S.D. Ind. May 30, 2002) .................................................................18

*Krispin v. May Dep't Stores Co.*, 218 F.3d 919 (8th Cir. 2000)......................*passim*

*McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (U.S. 1991)............................7

*Munoz v. Pipestone Financial LLC*, 513 F.Supp.2d 1076
(D. Minn. 2007).................................................................13, 14, 15

*Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285 (7th Cir. 2005)................................15

*Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341 (2d Cir. 2008)...................22

*Phipps v. FDIC*, 417 F.3d 1006 (8th Cir. 2005) ................................................15, 16

*Sawyer v. Bill Me Later, Inc.,* 2014 U.S. Dist. LEXIS 71261
(D. Utah May 23, 2014) ....................................................14, 15, 22

*SPGGC, LLC v. Blumenthal*, 505 F.3d 183 (2d Cir. 2007) .....................................23

*Ubaldi v. SLM Corp.*, 852 F.Supp.2d 1190 (N.D. Cal. 2012) ................................17

*Vargas v. Choice Health Leasing,* 2010 U.S. Dist. LEXIS 88308
  (S.D.N.Y. 2010) ..................................................................19

*Wachovia Bank, N.A. v. Burke*, 414 F.3d 305 (2d Cir. 2005)...................................22

*Watters v. Wachovia Bank, N.A.*, 550 U.S. 1 (2007) .................................22

*West Virginia v. Cashcall, Inc.*, 605 F. Supp. 2d 781
  (S.D.W. Va. 2009)................................................................20

*Zink v. First Niagra Bank, N.A.*, 2014 U.S. Dist. LEXIS 66456
  (W.D.N.Y. 2014) ................................................................23

**Rules**

Fed. R. Civ. P. Rule 23(f) ....................................................2, 5

**Regulations**

12 C.F.R. § 7.1004(a).........................................................16

# Preliminary Statement

This appellee brief is respectfully submitted on behalf of defendants-respondents Midland Funding, LLC ("Midland") and Midland Credit Management, Inc. ("MCM") (collectively the "Respondents"), who respectfully submit that Appellant's appeal should be denied for two reasons. First, after the decision subject to this appeal was entered, Appellant Madden stipulated that she received the terms and conditions that provided for application of Delaware law, which permitted the interest rate charged. Madden's complaint seeks violations of New York's usury laws which Madden has stipulated do not apply to her account, leaving Madden with no cognizable claim. Second, the National Bank Act preempts all claims, such as those presented in this case, of state usury violations against National Banks and their assignees. Madden claims this preemption does not apply to assignees, but this runs contrary to well-established law and is an unsupported position. As Madden herself has no valid claim, and as the NBA preempts all such claims of state law, the underlying decision should be upheld.

# Corporate Disclosure Statement

Defendants Midland and MCM hereby makes the following Corporate Disclosure Statement:

Midland and MCM are subsidiaries of Encore Capital Group, Inc., which is a publicly traded company.

# Summary of Argument

Appellant Madden seeks to reverse the September 30, 2013 order of the United States District Court for the Southern District of New York by the Honorable Cathy Seibel, which denied i) motion to strike the offer of judgment of Midland, ii) summary judgment, and iii) class certification pursuant to Fed. R. Civ. P. Rule 23(f) (the "Decision").

For the reasons set forth below, the appeal should be denied. Appellant asserts that Respondents violated the Fair Debt Collection Practices Act ("FDCPA") by charging interest rates on an account that exceeded New York's usury laws. Respondents moved for summary judgment on the basis that the underlying credit card agreement provided for Delaware, not New York, law which permitted the interest rate in question. Appellant claimed that Respondents failed to show they were properly assigned her account, and also that she never received the "change in terms" that set forth Delaware law as the choice of law. The court found these issues of fact prevented judgment for Respondents. However, subsequent to the entry of the decision of the trial court, Appellant has since stipulated that Respondents established ownership of the account, and also that she received the "change in terms" that applied the law of Delaware which permits the interest rate charged. Thus, Appellant has no valid claim of usury under any circumstance.

Additionally, Respondent's claims are wholly preempted by the National Bank Act ("NBA"). Appellant admits that the NBA bars state usury claims against National Banks, and admits that the NBA applied to Bank of America ("BOA"), who was the originating bank that later assigned the account to the Respondents. Appellant misstates the law in claiming that NBA protection does not follow the account to assignees, and argues without any valid support that the originating bank must retain control over the account in order for the NBA to follow. There is no such requirement, nor does Appellant identify any supporting caselaw.

This argument runs contrary to well-established law regarding assignment of accounts, and the authorities that have examined this exact issue in the FDCPA context have unanimously found that where, as here, the originating bank was entitled to NBA preemption, the NBA will follow to assignees.

The trial court readily observed that the authorities on point, including the key holding of *Krispin v. May Department Stores,* specifically held that consumer credit agreements do not lose the protections of the NBA when assigned to non-National Banks. Several decisions speak to the issue and refer to *Krispin,* and all uniformly hold that in determining whether the NBA applies, the focus is on the originating entity. Where, as here, the originating entity qualifies for NBA preemption, this is not lost when the National Bank assigns the account. Madden has no response to this point, except to claim that other cases require continuing

3

control by the National bank for the protection of the NBA to apply to the assignee. However, as demonstrated below, none of the cited authorities actually stand for this proposition. Madden's position is simply unsupported.

For these reasons, the underlying decision should be upheld.

## Counter-Statement of Facts

Appellant Madden opened a consumer credit card account with BOA on April 23, 2005. A-103. When opening the credit card account, Madden agreed to be bound by the terms and conditions of the cardholder agreement. A-103. On October 19, 2006, BOA's terms were amended. A-103. The new terms increased the collectable amount of interest to an amount allowable under Delaware law, which law allows for interest rates greater than 25%, and Delaware was the applicable forum pursuant to the Cardholder agreement. A-103 – A-104. On May 30, 2014, the parties stipulated that Madden received the new Cardholder Agreement and Change in Terms in 2006. A-135 – A-139.

Madden defaulted on her account and, on November 10, 2010, the charged-off debt was "sold, transferred, and set over unto" Midland. A-104. Under Midland's authority to "settle, adjust, compromise and satisfy" Madden's account, MCM sent a debt collection letter applying 27% interest on behalf of Midland. A-104.

Madden claims that Midland sought to collect a usurious amount of interest, Appellant never made payment to Respondent, and thus the Respondents are in violation of the FDCPA. A-104 – A-105.

## Procedural History

By an order dated September 30, 2013, Honorable Cathy Seibel of the United States District Court for the Southern District of New York denied i) Madden's motion to strike the offer of judgment of Midland, ii) Respondents' summary judgment, and iii) Madden's motion for class certification pursuant to Fed. R. Civ. P. Rule 23(f). A-99 – A-133. The relevant issue in both the underlying motions and this appeal is whether Midland, as an assignee of BOA (which is undisputedly a National Bank, covered under the NBA) is afforded the protections from state usury laws under the NBA. A-105, A-110. Judge Seibel held that "assignees should be afforded the same protections as those given to the bank itself with regard to charging a particular interest rate." A-109. The alternative ruling could perversely cause consumers to purposely go into default for the sake of a more favorable interest rate. A-109.

By stipulation dated May 30, 2014, Midland agreed to withdraw its offer of judgment, leaving it null and void, and Madden agreed that she was in receipt of BOA's amended Cardholder Agreement and Change in Terms which set forth the disputed interest rate and choice of law. A-138.

# Questions Presented

1. Whether Madden's receipt of terms and conditions agreeing to Delaware law, wherein it is undisputed that the rate charged was not usurious, bars her claims under the FDCPA?

2. Whether the NBA applies to assignees of credit agreements where the originating entity was a National Bank and fully assigns the account to a non-bank?

Respondents respectfully state both questions should be answered in the affirmative.

# Argument

Irrespective of the question of whether the NBA applies to non-bank assignees, Madden does not possess a viable claim. Madden has stipulated to the two open issues preventing judgment in the underlying action, namely that FIA validly assigned Madden's account to the Respondents, and that Madden actually received the cardholder agreement and change in terms that provided for the application of Delaware law. A-138. As the rate charged was not usurious under Delaware law, there is no violation of any law and thus no violation of the FDCPA, leaving Madden without any viable claim.

Additionally, this FDCPA claim based upon a purported violation of state usury law is wholly preempted by the NBA, which unambiguously applies to

National Banks and their assignees. The Decision identified the relevant supporting authorities and correctly rejected Madden's unsupported claims that the NBA somehow does not apply to assignees of National Banks. The trial court properly recognized that the focus is on the originating entity – here the National Bank BOA – and that preemption follows the account even where it is assigned to non-bank assignees. Thus, the claims are preempted by the NBA.

**Point I.      Madden Has No Viable Claim As Delaware Law Permits The Interest Rate Charged**

The application of the NBA to the assignment of a consumer credit agreement to a non-National bank assignee actually may not need to be resolved at all. The reason for this is that Madden has stipulated to two facts that leave her without any valid claim, thereby obviating the necessity of resolving the question of the application of the NBA. The interest rate challenged by Madden was permitted under Delaware law. Madden has stipulated to the receipt of the terms and conditions which bound her to that interest rate and the law of Delaware. Thus, the attempts of MCM to collect the interest was not a violation of the FDCPA. Appellate courts are not required to consider matters not in controversy if the action is resolved by a separate issue.[1]

---

[1] Where a narrow issue exists, a Court can decide, on De Novo review, to consider only it. *See, e.g., McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 491 (U.S. 1991) (declining to consider issues other than the narrowest one); *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004) (after identifying the issues presented by the parties, the Court "write[s] only to clarify the narrow issue"); *Baur v. Veneman*, 352 F.3d 625 (2d Cir. 2003); *Brewer v. West Irondequoit*

Specifically, the Decision by Judge Seibel denied summary judgment to Respondents because of certain limited and specific factual issues. Respondents argued that the terms of the credit card agreement, and specifically a "change in terms" dated August 14, 2006 ("Change in Terms"), were sent to and received by Madden. A-103 – A-104. The Change in Terms allowed BOA (and later Respondents via the assignment) to charge interest that was legal under Delaware law. A-104.

In this case, the Credit Card Agreement in question contains the following choice-of-law provision:

> "This Agreement is made in Delaware and we extend credit to you from Delaware. This Agreement is governed by the laws of the State of Delaware (without regard to its conflict of laws principles) and by any applicable federal laws." A-58.

According to Delaware law, the interest rate charged (27 percent) was permitted, a point conceded by Madden. A-104, A-106. However, Madden first disputed ever receiving the Change in Terms, and thus the motion was denied pending a later factual determination. A-105.

The Decision noted the disputed factual issues included whether an agreement existed between Madden and BOA, and also whether Madden's debt was validly assigned to the Respondents. A-105. Subsequent to the Decision, the

---

*Cent. Sch. Dist.*, 212 F.3d 738, 743 (2d Cir. 2000) (in a de novo review, considering only the narrow issue of "whether the plaintiffs have satisfied the heightened burden").

parties entered into a stipulation resolving both of these issues. Specifically, Madden stipulated that "FIA assigned [Respondents] Ms. Madden's account, and that [Madden] received the Cardholder Agreement and Change of Terms discussed in the Order." A-138. Additionally, the stipulation provided that the contents of the stipulation cannot be used to challenge Ms. Madden's suitability as class representative. A-138.

The effect of the stipulation is two-fold. First, Madden has no individual claims. As Delaware law applies, none of New York's policy prohibitions apply. Simply put, Madden has no claim under New York law or Delaware law, irrespective of whether the NBA applies.

While Respondents do not challenge Madden's suitability as class representative, Madden simply cannot participate as a member of the purported class regardless of her status as representative. [2] The Decision in denying class certification noted that the requested class could include only those who contest receiving terms that allow an out of state bank to charge Delaware rates that would otherwise be usurious in New York, a point that would require individual review. A-125. Here, Madden stipulates to receiving the terms and conditions, thereby eliminating herself from the putative class.

---

[2] Class Certification was denied. A-131. The matter before this Court is Appellant's individual claim. A-137.

Simply put, as Madden agreed to the terms that provide for Delaware law, and the rates are not usurious, there simply is no possible violation of the FDCPA. Accordingly, irrespective of the decision on whether the NBA applies, Madden's individual claim must be dismissed.

Accordingly, Madden's appeal should be denied in its entirety.

**Point II.      The NBA Applies In The Event Of An Assignment**

The National Bank Act preempts state claims for usury, and it is undisputed that Madden's account originator – BOA – qualified for NBA preemption. Madden does not contest that her account, while at BOA, was subject to preemption under the NBA, and thus there is no question that the NBA applied to Madden's originating creditor.  Madden merely claims that preemption does not follow to assignees of National Banks.  As discussed below, the law is clear that the NBA applies to assignees of such National Banks regardless of whether the assignees themselves are National Banks.

The trial court in the Decision addressed the decision in *Krispin v. May Dep't Stores Co*., 218 F.3d 919 (8th Cir. 2000), which found that NBA preemption followed from National Banks to non-bank assignees.  In *Krispin*, a store assigned its credit card accounts to a bank that was not subject to the state's usury laws. *Krispin*, 218 F.3d at 924.   The bank increased the interest rates on the accounts

10

above the state maximum. Later, the bank assigned certain accounts back to the store, a non-bank. *Id*. at 924.

To be clear, in *Krispin*, there were *two assignments* – the first assignment was from the store originating the credit cards at issue (a non-bank) to a bank, and later a second assignment by the bank back to the store. *Krispin*, 218 F.3d at 921. The plaintiffs in *Krispin* claimed that the *first assignment* was invalid because the contract did not allow new parties unless all parties consented. *Id*. at 923. The court found that *with regard to the first assignment* there was no new party being added but rather an assignment – namely a substitution of a party. *Id*. In rejecting the argument that a new party was added, the *Krispin* court noted: "[t]hus, the agreement between the store and the bank effected a valid assignment to the bank of whatever contractual rights and duties the store bore toward its pre-existing credit card customers." *Id*. at 924.

The *Krispin* court then found that, with regard to the *second assignment* whereby accounts were assigned back to the store, it "makes sense to look at the originating entity (the bank), and not the ongoing assignee (the store), in determining whether the NBA applies." *Id*. The rationale offered by the *Krispin* court was because it was the bank, not the assignee, that "sets such terms as interest and late fees." *Id*.

11

The *Krispin* court focused on the originating entity, noting that if the originating entity set the terms then the mere fact that the account was later assigned does not invalidate the application of the NBA: "moreover, the store's purchase of the bank's receivables does not diminish the fact that it is now the bank, and not the store, that... sets such terms as interest and late fees." *Id*. at 924.

Notably, neither *Krispin* nor the case at bar involved a change in terms by the non-bank. In the instant case, Respondents continued to collect on the terms and conditions *set by BOA*, a national bank protected by the NBA. Thus, just as in *Krispin*, the case before this Court involves the setting of the interest rate by the national bank, and thus because it was the bank who was "acting" in setting interest terms the NBA will follow that contract, even if it is assigned.

Recognizing the preclusive effect of the *Krispin* decision, Madden misconstrues *Krispin* claiming it holds that in order to determine whether the assignee qualifies for the NBA, you must look to the *current owner of the debt*. Thus, according to Madden's view of *Krispin*, once a bank assigns an account to a non-bank, the NBA does not apply because the focus is on who owns the account "now." *See* Brief for Plaintiff-Appellant, dated August 15, 2014 ("Pl. Mem.") p. 26-27. Madden misinterprets the holding of *Krispin* by saying the focus is on who owns the account "now," when really *Krispin* is saying: look to the entity that "sets such terms as interest and late fees." *Krispin*, 218 F.3d at 924; Pl. Mem. p. 26-26.

12

Both *Krispin* and the case at bar involve the situation where the originating entity that set the interest rate was a National Bank; a point that Madden fails to recognize.

The trial court readily observed that Madden's reading of *Krispin* "simply mischaracterizes the decision."  A-109.  It is hard to understand how Madden can continue to misrepresent the holding of that decision.  Despite the clear explanation afforded by Judge Seibel and the many cases cited to support the application of the NBA to an assignee of a national bank, Madden continues to claim that *Krispin* held that the NBA protection in that case applied only because the bank held some interest in the accounts.  The *Krispin* decision made no such finding.

In contrast to Madden's claims, the Decision in the trial court also cited to several supporting decisions directly on point.  The Decision found that "multiple courts have concluded that in determining whether the National Bank Act applies, "courts must look at the originating entity, the bank, and not the ongoing assignee."  The Decision cited to *Munoz v. Pipestone Financial LLC,* 513 F.Supp.2d 1076 (D. Minn. 2007) in support, yet Madden conspicuously omits any discussion of the decision.  *Munoz* presents several facts that are very similar to the facts in the case at bar, and presents basically the same scenario.  Mr. Munoz opened a credit card account with a national bank, First USA Bank, N.A., also chartered in Delaware. *Munoz*, 513 F.Supp.2d at 1078. Munoz defaulted after

13

seven years and the account was assigned to Unifund CCR Partners, who later

assigned the account to Pipestone, a purchaser of defaulted debt portfolios. *Munoz*

513 F.Supp.2d at 1078. In finding that the NBA preempts state usury claims, the

court relied on *Krispin*, finding

> Although Pipestone is not a national bank, courts must
> look at the originating entity (the bank) and not the
> ongoing assignee…in determining whether the NBA
> applies.

> Thus, Defendants properly attempted to collect interest
> from Munoz at the rate specified in the Cardmember
> Agreement.

> *Munoz* 513 F.Supp.2d at 1079.

*Munoz* speaks directly to the situation here. Respondents purchased

Madden's account from a national bank and sought to collect at the rate specified

in the agreement. The NBA applied to BOA, and thus it applies to Respondents.

Madden's glaring omission of the *Munoz* decision can only be explained as

intentional as it squarely refutes Madden's claims.

*Munoz* continues to be good law and has been cited with approval in the

time since the Decision was entered in 2013. For example, in *Sawyer v. Bill Me*

*Later, Inc*., 2014 U.S. Dist. LEXIS 71261 (D. Utah May 23, 2014), the court relied

on *Munoz* in finding that non-bank assignees can continue to charge and collect

interest rates from the original creditors:

> Also, Defendants have cited cases permitting non-bank
> assignees to continue to "charge" and "collect" the

14

interest rates permitted by Section 27. *See FDIC v. Lattimore Land Corp.*, 656 F.2d 139, 148-49 (5th Cir. 1981) (the identity of the original creditor is dispositive because the "non-usurious character of a note should not change when the note changes hands"); *Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 288 (7th Cir. 2005) (common law of assignments allows assignees to collect interest at rate allowed to originating creditor); *Munoz v. Pipestone Fin., LLC,* 513 F.Supp.2d 1076, 1079 (D. Minn. 2007) (state law claim for excessive interest against loan assignee preempted), each of which survive Plaintiff's attempt to distinguish their applicability to the facts of this case in his Opposition.

*Sawyer*, 2014 U.S. Dist. LEXIS 71261, at *28-29.

As addressed above and only briefly reiterated here, the Decision of the District Court correctly pointed out Madden's misreading of *Krispin*:

Plaintiff contends that *Krispin*, among other cases, is inapposite, because unlike the original creditor there, FIA did not retain any interest in the servicing or collection of Plaintiff's debt. *Krispin*, however, does not stand for the proposition that the NBA will only apply if the national bank retains a legal interest and/or role in the debt collection. In *Krispin*, the district court based its conclusion on the fact that it was the bank, and not the assignee, that was the originator of the loan…"

A-108.

The Decision was also substantiated by analogous decisions. *See Phipps v. FDIC,* 417 F.3d 1006 (8th Cir. 2005) ("NBA preemption available to the loan originator also applied to the borrower's claims against a subsequent purchaser of the loan."); *FDIC v. Lattimore Land Corp.*, 656 F.2d 139 (5th Cir. 1981) ("The non-usurious character of a note should not change when the note changes

15

hands."). Madden tries to "explain away" the decision in *Phipps* by claiming that decision was made "without significant discussion." Pl. Mem. p. 34. Madden claims that the ability of the assignee in *Phipps* to charge interest was not at issue, thereby limiting the decision. *Phipps v. FDIC*, 417 F.3d 1006, 1013 (8th Cir. Mo.2005) (citing *Krispin*, 218 F.3d at 924); *see also* 12 C.F.R. § 7.1004(a). However, the holding of that decision that courts "look at the originating entity (the bank), and not the ongoing assignee" clearly contradicts Madden's claim that the law of the Eighth Circuit is somehow favorable to her position. Madden also challenges *FDIC v. Lattimore Land Corp.* as having no application to the case at bar, but that court held "the non-usurious character of a note should not change when the note changes hands." 656 F.2d 148-49; *see also* Pl. Mem. p. 35.

Madden attacks the citation in the Decision to *Nichols v. Fearson*, for the quote that "a contract, which, in its inception, is unaffected by usury, can never be invalidated by any subsequent usurious transaction." 32 U.S. 103, 109 (1833); *see also* Pl. Mem. p. 33. However, Madden's "attack" is misplaced as this quote was not central to the Decision and does not change the analysis at all.

Madden challenges the concern raised in the Decision that to prohibit assignees from charging the same interest rate would give debtors a "perverse incentive" to avoid their obligations long enough for the debt to be sold to a debt collector to obtain a lower interest rate. Pl. Mem. p. 36. Madden claims a court

cannot imply preemption based only upon its policy preferences. Pl. Mem. p. 37. This is absurd, and no support is offered whatsoever. The trial court appropriately acknowledged a foreseeable problem that would result from Madden's theory, and it was properly raised and addressed.

Madden argues that a bank must have a continued interest and operational involvement in any assignment in order for the NBA to continue to apply. Pl. Mem. p. 25. Madden readily admits, however, that there is no support for her theory by any decision of this Court – "this Court has never explicitly addressed the question presented." Pl. Mem. p. 11.

Madden further claims that her interpretation of *Krispin* has been recognized by other courts "around the country" (though she admits not in the Second Circuit). Pl. Mem. p. 30. This simply is not accurate. In furtherance of this contention, plaintiff cites to the distinguishable case of *Ubaldi v. SLM Corp.,* 852 F.Supp.2d 1190 (N.D. Cal. 2012), only for non-binding dicta. The *Ubaldi* court distinguished itself from *Krispin* altogether as the Court noted that it was unclear what entity was the "actor" in setting the interest rate terms:

> *Krispin* is distinguishable from this case, both because it decided the issue of removal based on complete preemption, rather than express preemption, and also because the parties there did not dispute whether the national bank issued the credit and processed and served the accounts.
>
> *Ubaldi*, 852 F.Supp.2d at 1200.

17

Madden's next "authority" reveals Madden's complete misunderstanding of *Krispin*. Madden claims *Hudson v. ACE Cash Express, Inc.*, 2002 U.S. Dist. LEXIS 11226 (S.D. Ind. May 30, 2002) interpreted *Krispin* to "require analysis of the national bank's ongoing interest in the account" and that "the facts of *Krispin* and *Hudson* are in sharp contrast to the case at bar, in which the National Bank in question had transferred 100% of its rights to Midland." Pl. Mem. p. 28-29. Madden's statement implies that *Hudson* held that *Krispin* hinged on the bank retaining an interest, which is the purported "sharp contrast" to the case before this Court. In fact, *Hudson* made no such finding. Instead, the court in *Hudson* found that ***Krispin* did not apply** because it dealt with a situation where there was no retained interest at all whereas in *Hudson* there was a retained five percent interest:

> In contrast to the national bank in *Krispin*, which held no financial stake in the loans, Goleta retained a 5% state in its loan to Hudson."
>
> *Hudson*, 2002 U.S. Dist. LEXIS 11226 at *14.

Therefore, contrary to Madden's claim of "sharp contrast" the court in *Hudson* found *Krispin* was based on the same analysis that the trial court performed, one with no retained interest and full assignment of all rights.

Madden then cites to *Community State Bank v. Knox*, 850 F Supp.2d 586 (M.D.N.C. 2012). Madden does not even attempt to claim the decision adds to her argument that control is required, and instead she quotes a note stating *Krispin*

18

involved a situation where "all accounts had been completely assigned." *Community*, 850 F Supp.2d at 588, n.9; *see also* Pl. Mem. p. 29. This seemingly undermines the claim of "sharp contrast" and does not speak to remnants of control, again supporting the trial court's view of *Krispin*, not Madden's.

Madden, based upon her analysis of *Krispin, Ubaldi, Hudson* and *Community* makes the conclusion that "the logic of Krispin and progeny dictate that where – as here – national bank retains no interest whatsoever in the loan going forward and is not a subsidiary or otherwise related to the assignee, the NBA may not be invoked." Pl. Mem. p. 30. This conclusion is outrageous, and not supported by any of the decisions in *Krispin, Ubaldi, Hudson* or *Community*. Madden's argument simply does not make sense. There are no cases cited that say an assignee loses NBA status, and thus Madden's grand conclusion is wholly unsupported and misrepresents event the most basic reading of the above cases. Accordingly, Madden's claim remains wholly unsupported.

Madden then claims that other cases lend "additional support" despite the fact that none of the cases above – *Krispin, Ubaldi, Hudson* and *Community* – provide any support. Madden cites this Court's decision in *Vargas v. Choice Health Leasing*, 2010 U.S. Dist. LEXIS 88308 (S.D.N.Y. 2010) that Madden admits "interpreted Section 85 of the NBA in a different context." Pl. Mem. p. 30. This Court cited to *Krispin* to say "the NBA governs only national banks. . .

Plaintiff's NBA claims against Choice fails because Choice is not a national bank." Pl. Mem. p.30. However, *Vargas* did not involve an assignment from a bank to a non-bank, and thus it offers no "additional support" of anything.

Madden's citation to a vague statement of dicta in *West Virginia v. Cashcall, Inc.*, 605 F. Supp. 2d 781 (S.D.W. Va. 2009) does not support her argument. The court therein stated: "It is true that in some cases, courts have found that state usury law claims nominally directed against a non-bank entity were actually directed against a related bank and thus were completely preempted by the FDIA or NBA. . . . But those cases are distinguishable from this one. . . . [T]he state-banks and agents in *Vaden* and *Krispin* were related either through an indemnity agreement or through their corporate structure. In contrast, CashCall and the Bank are completely separate entities." *Cashcall*, 605 F. Supp. 2d at 787. Although the *Cashcall* court attempted to distinguish *Krispin*, Madden explains the quote as saying the case at bar is similar to *Cashcall* because they are both separate entities. Pl. Mem. at 31. This does not advance any cognizable argument. Regardless of Madden's view of this case, it has no application as it involved an attempt to remove to federal court an action against an entity that claimed to be an "agent" of the bank, not the assignee, and thus is completely distinguishable. *Cashcall* at p. 9.

After exhausting all federal cases, Madden cites to a New York state court decision in *Goldman v. Simon Property Group, Inc.*, 31 A.D.3d 382 (2d Dep't

2006) to say New York's appellate division "declined to find that the NBA preempted state consumer protection laws regarding fees associated with gift cards." Pl. Mem. p. 32. However, Goldman did not deal with an assignment of an interest from a bank to a non-bank, and the court could not resolve whether the bank or non-bank was the real party in interest: "nothing in the record 'conclusively establishes' [] that the national bank, as opposed to the defendant, is the real party in interest." *Goldman*, 31 A.D.3d at 383; Pl. Mem. p. 38. Thus, *Goldman* offers no support to Madden's claims.

The foregoing constitutes the sum total of purported authority for Madden's claims that a contract from a national bank and assigned to non-national bank loses its NBA preemption. Madden has not cited one case directly supporting this theory, and she admits there are none in the Second Circuit.

As the foregoing makes clear, the Decision was based upon substantial authority with analogous situations. The same cannot be said for Madden's authorities, none of which speak directly to the question presented nor support her position. For these reasons, the Decision's conclusion that the NBA should apply to Respondents herein should be upheld.

### *Madden's Numerous Citations to Admittedly Non-Applicable Situations Do Not Change The Analysis*

Madden curiously argues for thirteen pages to say that various situations *do not apply* to the case at bar. Madden readily and purposefully admits that they do

21

not apply.  In Madden's words, these cases "indicate a far less sweeping interpretation of the NBA's preemptive scope than the interpretation of the District Court."  Pl. Mem. p. 11.  This is incorrect.  Therefore, pages 12-25 in Madden's appellate brief warrant only a brief response below.

Madden begins by making the blanket statement that This Court has "limited applications of the NBA to non-bank entities to situations where (a) the non-bank entity is controlled by the bank and subject to OCC regulation to the same extent as the bank itself and/or (b) explicit mention of the non-bank entity is found in the statute itself."  Pl. Mem. p. 17.  Madden cites to *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305 (2d Cir. 2005) for the point that subsidiaries "should not be treated differently" than parent banks, but this does not address the main question presented – namely whether the NBA extends to assignees.

The next "authority" also fails to address the question presented.  Madden cites to *Watters v. Wachovia Bank, N.A.,* 550 U.S. 1 (2007), another off-point case dealing with "subsidiaries."  Madden then addresses other distinguishable situations – "third party account servicers" in citing to *Sawyer*, 2014 U.S. Dist. Lexis 71261; and "duly authorized agents" in citing to *Pac. Capital Bank, N.A. v. Connecticut,* 542 F.3d 341 (2d Cir. 2008) – to make the point that "Respondents do not fit into either category."  Pl. Mem. p. 19.  Madden completes the distinguishable cycle of cases in citation to several cases to claim Respondents

have "no special status under the NBA." *SPGGC, LLC v. Blumenthal*, 505 F.3d

183 (2d Cir. 2007); *Zink v. First Niagra Bank, N.A*., 2014 U.S. Dist. LEXIS 66456

(W.D.N.Y. 2014); *see also* Pl. Mem. p. 19. None of these cases have any

application here.

   Madden next makes the convoluted argument that Respondents have not met

their burden that the NBA applies. The argument is convoluted because Madden

does not make the relevant argument that assignees cannot enjoy NBA status

unless they too are national banks but, rather, Madden argues that application of

the New York usury statute to non-bank debt buyers does not interfere with a

national banks' exercise of powers. Here, the question is not whether the NBA

*ever applied*. Plaintiff readily admitted that "it is undisputed that [Bank of

America], as a national bank, was not subject to New York's usury laws." Pl.

Mem. p. 6. Thus, there is no burden whatsoever to show an interference with a

national bank's exercise of powers, and this entire convoluted argument is no more

than a red-herring.

   Nevertheless, Madden goes for several additional pages with a discussion of

the decision in *SPGGC, LLC* , wherein this Court declined to apply NBA status not

to an assignee such as here but where an "agent" claimed to be a "subsidiary" and

entitled to special status. 505 F.3d at 183; Pl. Mem. p. 22-25. None of this is

relevant in the least as there are no claims of agency, subsidiary or special status.

23

In fact, none of the above has any relevance whatsoever to the question presented in this appeal.

Madden raises the desperate and meritless argument that preemption is "not assignable." Pl. Mem. p. 37. First, Madden admits that This Circuit has not addressed this issue. Pl. Mem. p. 37. More importantly, none of the cases deal with an analogous situation and cite only generic quotes that "the assignee does not enjoy the assignor's preemption where the alleged misconduct is committed by the assignee post-assignment." Pl. Mem. p. 38. This point does not alter any of the above analysis. Madden's account was not alleged to have been changed or a higher rate charged after the assignment, and thus these cases simply do not have any relevance.

Finally, Madden claims that expansion of the NBA preemption "contradicts Congress" citing to Dodd-Frank in the mortgage lending context. Pl. Mem. p. 39. Madden quotes "the OCC had actively created an environment where abusive mortgage lending could flourish without State controls" and thus Dodd-Frank's mandate sought to more narrowly construe statutes. Pl. Mem. p. 41. First, this again does not speak to the question presented. Second, it was not raised before the trial court and thus was waived. Finally, it is not offered for any other purpose than to say these regulatory changes "run contrary to the District Court's expansive reading of the NBA's preemptive power." Pl. Mem. p. 42.

Accordingly, these non-applicable cases do not alter the substantial authority identified in the Decision and should not be considered.

## Conclusion

Therefore, it is respectfully submitted that the Decision of the trial court be upheld in all respects, and therefore this claim must be dismissed.

Dated:        November 13, 2014
                New York, New York

                        Respectfully submitted,

                      WILSON, ELSER, MOSKOWITZ,
                      EDLEMAN & DICKER LLP

By: _____ s/ _____
    Thomas A. Leghorn, Esq.
    Joseph L. Francoeur, Esq.
    150 E. 42nd Street
    New York, NY 10017
    (212) 490-3000 (phone)
    (212) 490-3038 (facsimile)
    thomas.leghorn@wilsonelser.com
    *Attorneys for Defendants*
    Our File No. 10277.00145

## CERTIFICATION PER FED. R. APP. P. 32(A)(7)(C)

This is to certify that the foregoing brief complies with the 14,000 word limitation requirement of Fed. R. App. P. 32(a)(7)(B), in that the brief is calculated by Microsoft Word to contain 5,784 words, exclusive of the Table of Contents and Table of Authorities.